# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| SUNDER ENERGY, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2023-0988-JTL |
| | ) | |
| TYLER JACKSON, FREEDOM FOREVER | ) | |
| LLC, BRETT BOUCHY, CHAD TOWNER, | ) | |
| FREEDOM SOLAR PROS, LLC, and SOLAR | ) | |
| PROS LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION DENYING PRELIMINARY INJUNCTION

Date Submitted: November 16, 2023
Date Decided: November 22, 2023

Raymond J. DiCamillo, Chad M. Shandler, Steven J. Fineman, Kelly E. Farnan, Kevin M. Gallagher, Christine D. Haynes, Alexander M. Krischik, Sara M. Metzler, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Joshua Berman, Jackson Herndon, Paul C. Gross, Ben Nicholson, Michael H. Rover, PAUL HASTINGS LLP, New York, New York; *Attorneys for Plaintiff Sunder Energy, LLC.*

Timothy R. Dudderar, Aaron R. Sims, Abraham C. Schneider, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Maureen M. Stewart, FOLEY & LARDNER LLP, Tampa, Florida; Jordan C. Bledsoe, Tyler Dever, Bryce W. Talbot FOLEY & LARDNER LLP, Salt Lake City, Utah; *Attorneys for Defendant Tyler Jackson.*

Paul J. Lockwood, Jenness E. Parker, Jessica R. Kunz, Matthew R. Conrad, Eric M. Holleran, Mallory V. Phillips, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Wilmington, Delaware; Karen Hoffman Lent, Evan R. Kreiner, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, New York, New York; *Attorneys for Defendants Freedom Forever LLC, Brett Bouchy, Chad Towner and Freedom Solar Pros, LLC.*

**LASTER, V.C.**

Sunder Energy, LLC ("Sunder") sells residential solar power systems. Sunder does not install the systems. Once a Sunder salesperson signs up a deal, the installer takes over the process. Until September 2023, Sunder had an exclusive dealer agreement with Freedom Forever LLC ("Freedom"), one of the nation's largest installers.

Tyler Jackson was Sunder's head of sales. During 2022 and 2023, Sunder's relationship with Freedom deteriorated. In summer 2023, Freedom's principals encouraged Jackson to join Solar Pros LLC, an up-and-coming Freedom dealer.

Between Monday, September 11, 2023, and Tuesday, September 19, nine of the twelve Senior Regional Managers, Regional Managers, and Co-Regional Managers who reported to Jackson joined Solar Pros. Over three hundred Sunder sales personnel followed them. None of the managers or sales personnel have any restrictions on their ability to work for a competitor or to solicit Sunder personnel.

On Friday, September 22, 2023, Jackson signed an independent contractor agreement with Solar Pros. Four hours later, he resigned from Sunder. On Monday, September 25, Solar Pros announced that Jackson had joined as its new President.

Sunder maintains that Jackson is bound by restrictive covenants. He received Incentive Units in Sunder, and the attorneys who drafted Sunder's LLC agreement embedded in its terms a set of restrictive covenants (the "Covenants") that bind any holder of Incentive Units. The Covenants consist of:

- A restriction prohibiting the holder from engaging in any competitive activity (the "Competition Restriction");

1

- A restriction prohibiting the holder from soliciting Sunder's employees and independent contractors (the "Personnel Restriction");

- A restriction prohibiting the holder from soliciting, selling to, accepting any business from, or engaging in any business relationship with any of Sunder's customers (the "Customer Restriction"); and

- A restriction prohibiting the holder from inducing, influencing, causing, advising, or encouraging any Sunder stakeholder to terminate its relationship with Sunder (the "Stakeholder Restriction").

The LLC agreement also imposes an expansive restriction on the use of Sunder's confidential information, broadly defined.

Each Covenant applies not only to the holder of the Incentive Unit but also to that person's "Affiliates," defined to include the holder's spouse, parents, siblings, and descendants, both natural and adopted. The Covenants thus purport to bind Jackson's wife and children. The Covenants apply during the period when the holder owns the Incentive Units and for two years afterward. A holder has no ability to transfer the Incentive Units, but Sunder can repurchase them for zero dollars if the holder is terminated or leaves other than for good reason. Because Sunder can decide not to repurchase the Incentive Units, the Covenants could be perpetual.

The Incentive Units are a form of incentive compensation. Jurisdictions other than Delaware have a significant interest in how businesses compensate employees and independent contractors and the extent to which businesses can attach restrictive covenants to those arrangements. Sunder has its headquarters in Utah, which has an obvious interest in that subject and has passed legislation to regulate it. Jackson lives in Texas, which has an interest in the extent to which its citizens

2

can earn a living. Freedom has its headquarters in California, and Solar Pros has its headquarters in Nevada, so those jurisdictions have interests as well.

But Sunder filed suit here—in Delaware—because Sunder is a Delaware LLC and its lawyers deployed the now widespread legal technology of inserting restrictive covenants into an internal governance document. Businesses and their lawyers do that so they can invoke Delaware's contractarian regime and argue that it should override how other jurisdictions regulate restrictive covenants.

That legal technology calls on the Delaware courts to adjudicate post-employment disputes for the country and potentially the world. In the past five years alone, the Court of Chancery has issued written decisions addressing disputes over restrictive covenants for businesses operating in Hong Kong,[1] Italy,[2] Alabama,[3]

---

[1] *Ainslie v. Cantor Fitzgerald, L.P.*, 2023 WL 106924 (Del. Ch. Jan. 4, 2023).

[2] *AlixPartners, LLP v. Mori*, 2022 WL 1111404 (Del. Ch. Apr. 14, 2022); *AlixPartners, LLP v. Mori*, 2019 WL 6327325 (Del. Ch. Nov. 26, 2019).

[3] *HighTower Hldg., LLC v. Gibson*, 2023 WL 1856651 (Del. Ch. Feb. 9, 2023); *FP UC Hldgs., LLC v. Hamilton*, 2020 WL 1492783 (Del. Ch. Mar. 27, 2020).

Arizona,[4] California,[5] Colorado,[6] Idaho,[7] Illinois,[8] Louisiana,[9] Nebraska,[10] New Jersey,[11] New York,[12] Oklahoma,[13] and Texas.[14] Only two businesses operated in Delaware, one of which filed two cases.[15] That list excludes transcript rulings.

For Delaware courts to address these matters is problematic because the Delaware franchise depends on other states deferring to Delaware law to govern the internal affairs of the entities that Delaware charters. Delaware risks jeopardizing

---

[4] *Dunn v. FastMed Urgent Care, P.C.*, 2019 WL 4131010 (Del. Ch. Aug. 30, 2019).

[5] *Gener8, LLC v. Castanon*, 2023 WL 6381635 (Del. Ch. Sept. 29, 2023); *Sorrento Therapeutics, Inc. v. Mack*, 2023 WL 5670689 (Del. Ch. Sept. 1, 2023); *UBEO Hldgs., LLC v. Drakulic*, 2021 WL 1716966 (Del. Ch. Apr. 30, 2021); *Focus Fin. P'rs, LLC v. Holsopple*, 250 A.3d 939 (Del. Ch. 2020); *Focus Fin. P'rs, LLC v. Holsopple*, 241 A.3d 784 (Del. Ch. 2020); *NuVasive, Inc. v. Miles*, 2020 WL 5106554 (Del. Ch. Aug. 31, 2020); *NuVasive, Inc. v. Miles*, 2019 WL 4010814 (Del. Ch. Aug. 26, 2019); *NuVasive, Inc. v. Miles*, 2018 WL 4677607 (Del. Ch. Sept. 28, 2018).

[6] *Mountain W. Series of Lockton Cos., LLC v. Alliant Ins. Servs., Inc.*, 2019 WL 2536104 (Del. Ch. June 20, 2019).

[7] *Kodiak Bldg. P'rs, LLC v. Adams*, 2022 WL 5240507 (Del. Ch. Oct. 6, 2022).

[8] *Centurion Serv. Gp., LLC v. Wilensky*, 2023 WL 5624156 (Del. Ch. Aug. 31, 2023).

[9] *AG Res. Hldgs, LLC v. Terral*, 2021 WL 486831 (Del. Ch. Feb. 10, 2021).

[10] *Cabela's LLC v. Wellman*, 2018 WL 5309954 (Del. Ch. Oct. 26, 2018).

[11] *CelestialRX Invs., LLC v. Krivulka*, 2019 WL 1396764 (Del. Ch. Mar. 27, 2019).

[12] *Intertek Testing Servs. NA, Inc. v. Eastman*, 2023 WL 2544236 (Del. Ch. Mar. 16, 2023); *Badger Hldg. LLC v. Kirsch*, 2018 WL 4709563 (Del. Ch. Oct. 1, 2018).

[13] *Parks v. Horizon Hldgs.*, LLC, 2022 WL 2821337 (Del. Ch. July 20, 2022).

[14] *U.S. Legal Support, Inc. v. Lucido*, 2021 WL 4940823 (Del. Ch. Oct. 22, 2021).

[15] *Lyons Ins. Agency, Inc. v. Wark*, 2020 WL 429114 (Del. Ch. Jan. 28, 2020); *Lyons Ins. Agency, Inc. v. Wilson*, 2018 WL 4677606 (Del. Ch. Sept. 28, 2018); *Physiotherapy Corp. v. Moncure*, 2018 WL 1256492 (Del. Ch. Mar. 12, 2018).

that deference if Delaware accommodates efforts to use the internal governance documents of its entities to override the law of other states on issues of great importance to them.[16]

For Delaware courts to address these matters is unsustainable because the Court of Chancery will never have sufficient resources to adjudicate restrictive covenant cases for Delaware entities throughout the world. The court's core role is to resolve internal governance disputes for Delaware entities. To Delaware's good fortune, the number of its entities has grown year over year. At the end of 2017, the starting point for the five-year lookback that this decision has used, Delaware had chartered more than 1.3 million entities.[17] At the end of 2022, there were over 1.9 million, reflecting aggregate growth of 46% and compound annual growth of nearly 8%. At that rate, the number of Delaware entities should easily crest 2 million in 2023.[18] Because some number of entities have disputes each year, more Delaware entities means more disputes. It thus should come as no surprise that the court's expansion from five to seven constitutional judges in 2018 was not a permanent fix. It enabled the court to meet 2018 demand, not future demand.

---

[16] See *Diedenhofen-Lennartz v. Diedenhofen*, 931 A.2d 439, 451–52 (Del. Ch. 2007) ("If we expect that other sovereigns will respect our state's overriding interest in the interpretation and enforcement of our entity laws, we must show reciprocal respect.").

[17] Del. Div. of Corps., 2017 Annual Report, https://corp.delaware.gov/stats/2017-annual-report/ (last visited Nov. 20, 2023).

[18] Del. Div. of Corps., 2022 Annual Report, https://corp.delaware.gov/stats/ (last visited Nov. 20, 2023).

5

For the Court of Chancery to entertain restrictive covenant cases from far and wide diverts the court's attention from its core mission. And it generates considerably more work. As this case shows, restrictive covenant cases often start with an emergency application for a temporary restraining order, followed by a highly expedited motion for a preliminary injunction. Rulings on those preliminary matters do not end the case, which can continue to a trial on requests for permanent injunctive relief and damages. The factual issues are difficult because they frequently involve assertions about surreptitious activity and betrayal, and the discovery disputes regularly involve questions about spoliation. The legal questions are equally complex because they require determining what law applies, parsing dense contractual clauses, and balancing competing interests.

A solution needs to be found, and the market is unlikely to provide it. This is an area where Delaware's interests and the interests of its bar as a whole conflict with the individual interests of clients and their lawyers. For any single business, it makes sense for a lawyer to advise the client to embed restrictive covenants in an internal governance document. And for any single business faced with a dispute over those restrictions, it makes sense for a lawyer to advise the client to file a lawsuit in the Court of Chancery. In the aggregate, that is a recipe for a tragedy of the commons.

A judicial solution is also unlikely, because judges decide specific cases. Doubtless there are many combinations of fixes involving choice of law, personal jurisdiction, and subject matter jurisdiction that could address this burgeoning problem. But a cure requires the involvement of policymakers beyond the courts.

In an ideal world, this case would have been filed in Utah, Nevada, or Texas. But the case is here, and it must be decided.

Sunder's application for a preliminary injunction against Jackson is denied because Sunder cannot establish a reasonable likelihood of success on the merits. The Covenants are part of an agreement that cannot be enforced against Jackson because the agreement originates in an egregious breach of fiduciary duty. The Covenants are also facially unreasonable in their own right.

Sunder's application for a preliminary injunction against the other defendants for tortiously interfering with the Covenants is denied for lack of an underlying breach of contract. Relief is also denied because Utah law governs that claim, and Utah requires conduct that is inherently tortious. The defendants engaged in conduct that could support a claim under the multi-factor balancing test that Delaware deploys, but not the inherently tortious conduct that Utah requires.

This ruling does not mean that Sunder cannot prove any claims or receive any remedy. Sunder might have non-contractual claims that it could prove against Jackson for the actions he took before resigning, and Sunder might be able to recover damages if it proves those claims. But Sunder cannot obtain the preliminary injunction it seeks.

# I.    FACTUAL BACKGROUND

The facts are drawn from the record developed in connection with Sunder's application for a preliminary injunction. The parties have submitted numerous documentary exhibits and the deposition testimony of eighteen fact witnesses.[19]

What follows are the facts as they are likely to be found after trial, based on the current record. The court must attempt to predict what the factual findings eventually will be. The findings of fact after trial may be different.

---

[19] Citations in the form "PX __" are to exhibits that Sunder submitted with its opening brief or reply brief. Citations in the form "FX __" are to exhibits that Freedom submitted with its answering brief. Citations in the form "JX __" are to exhibits that Jackson submitted with his answering brief. Citations in the form "[Name] __" refer to deposition transcripts.

The parties' choices for producing texts and emails made reviewing the record much harder than it needed to be. Sunder generally produced emails and text messages with times denoted in Greenwich Mean Time. To determine when events took place, the court had to consider what time zone the author would have been in and make an adjustment. Yet for email chains, Sunder only used that timing convention for the top email in the chain. Emails lower in the chain reflected the local time when they were sent.

The defendants used a different system. They produced text messages with times denoted in Greenwich Mean Time but emails with times denoted in local time, which was Pacific time for all of their custodians. Jackson similarly produced text messages with times denoted in Greenwich Mean Time and emails with times denoted in local time, which was Mountain time for him. Jackson also produced documents from the LGCY action that were processed by a different vendor, so no one could say what the timing convention was.

The use of Greenwich Mean Time and the combination of different timing conventions were not helpful. If this had not been an expedited application for a preliminary injunction, the court would have ordered the parties to resubmit all of the exhibits in a form that identified the local time and time zone for each communication. To avoid having to undertake that exercise in the future, parties should agree as part of a discovery plan on a consistent form of production that will promote efficiency rather than create confusion.

## A.    Sunder's Beginnings

Sunder is a solar sales dealer that is organized as a Delaware limited liability company and headquartered in Utah. Sunder currently operates in at least forty-seven states.

Sunder's sole business involves securing agreements with residential customers to install solar power systems for their homes. Until September 2023, Sunder acted as an exclusive dealer for Freedom, a leading installation firm led by Chad Towner and Brett Bouchy. Under Sunder's business model, teams of Sunder sales representatives went door to door, blitzing neighborhoods, to pitch Freedom systems to homeowners. When a sales representative inked a deal, the sales representative entered it into Freedom's sales portal. At that point, Freedom took over the process, installed the system, collected the payment from the customer, and paid a commission to Sunder, split between the sales representative who secured the deal and Sunder as an organization.

Sunder started business in August 2019, when Eric Nielsen, Max Britton, Tyler Jackson, Steven Cohen, Michael Gutschmidt, Jed Sewell, and Max Ganley (together, the "Co-Founders") left a different solar sales dealer named LGCY Power, LLC. All were in sales. Nielsen had been LGCY's Chief Revenue Officer—effectively its head of sales. Britton had been a Vice President. Jackson, Cohen, Gutschmidt, Sewell, and Ganley were Regional Sales Managers.

When they formed Sunder, the Co-Founders agreed on an equity split. Each Regional Sales Manager would receive eight percent for a total stake of 40%. Nielsen

and Britton would own the rest of the equity, giving them a 60% majority.[20] The Co-Founders envisioned that they all would own the same type of equity. There were no discussions of separate types of equity or different rights or obligations. Everyone expected that Nielsen and Britton would manage Sunder as its majority owners, but otherwise everything was expected to be equal.[21] The Co-Founders thought of themselves as partners, and they called themselves that.

With that understanding, the Co-Founders formed Sunder as a Delaware LLC by filing a certificate of formation with the Delaware Secretary of State on August 16, 2019. JX 1. At the time, the Co-Founders had not executed a written LLC agreement, but that did not mean that Sunder lacked an LLC agreement. It meant that Sunder operated under the default provisions of the Delaware Limited Liability Company Act (the "LLC Act"), subject to any specific unwritten understandings or agreements that the Co-Founders had.

On August 23, 2019, all of the Co-Founders executed a five-year exclusive dealer agreement with Freedom. JX 2 (the "Dealer Agreement"). Each Co-Founder

---

[20] Cohen 27–28; Sewell 16–17.

[21] Sewell testified that Nielsen and Britton would be the managers of the LLC. Sewell 27–28. It is not clear whether Sewell meant that Nielsen and Britton would be managing members of the LLC such that Sunder would be a manager-managed LLC in the formal sense contemplated by the LLC Act, or whether he simply meant that Nielsen and Britton would be the managers of the entity in the colloquial sense of its day-to-day managers. The consistent testimony from the Co-Founders that they envisioned everyone owning the same type of member interest suggests the latter. *See* Cohen 37–38; Sewell 28, 37–38; Jackson 323–25.

signed the Dealer Agreement as both a member of Sunder and individually. Nielsen also signed as President of Sunder. *Id.* at '748.

## B.     The LGCY Action

On September 23, 2019, LGCY sued the Co-Founders. JX 3. The Co-Founders and Sunder engaged Snell & Wilmer to represent them jointly in the LGCY action. JX. 4. Snell & Wilmer's engagement letter limited its engagement to representing the Co-Founders in the LGCY action. *Id.* at '704. The Co-Founders nevertheless regarded Snell & Wilmer as their lawyers more generally.

LGCY's claims included the contention that Britton had received grants of restricted stock units as part of his compensation, and those restricted stock units included restrictive covenants that lasted for two years. When Britton learned about the restrictive covenants, he had an understandable reaction:

> TWO years is a LONG time not to compete in the very industry I have bet my family's future on. This is what I have been doing for close to a decade. This is my career . . . .
>
> This seems very heavy handed. A two year non compete is nuts.

JX 6 at '493. A Snell & Wilmer attorney wrote back: "[G]reat initial thoughts. Thanks. We agree that this seems extremely heavy handed. We are looking at the reasons these agreements might not be enforceable." *Id.* at '492. Britton's email now drips with irony, as Sunder is currently attempting to enforce restrictive covenants against Jackson that could last even longer.[22]

---

[22] Sunder has tried to argue that Britton was differently situated because he was an independent contractor who only received restricted stock units as part of his compensation, while Jackson was head of sales and a part owner of Sunder. There is actually very little

Notwithstanding the LGCY action, Sunder's business took off. By December, Sunder had generated hundreds of thousands of dollars in commissions.

## C. The 2019 LLC Agreement

In fall 2019, Nielsen and Britton engaged Snell & Wilmer to draft an LLC agreement. JX 8 (the "2019 LLC Agreement"). The other Co-Founders were not involved in the process.

When the draft was ready, Nielsen and Britton went to Snell & Wilmer's offices, and attorneys from the firm walked them through the agreement. JX 7 at 9. The other Co-Founders were not invited to the meeting, and no one explained the agreement to them. Cohen 71–73; Sewell 153; Jackson 331–32. Nielsen testified that he could not have understood the 2019 LLC Agreement without the attorneys explaining it to him, and he invoked privilege in response to questions about the 2019 LLC Agreement on the grounds that his understanding came entirely from counsel. Nielsen 254–57.

The 2019 LLC Agreement dramatically changed the ownership structure of Sunder and radically altered its internal governance. Nielsen and Britton had their rights supercharged. The other Co-Founders had their rights emasculated. To call out some highlights, the 2019 LLC Agreement:

- Eliminated all fiduciary duties, turning Sunder into a purely contractarian entity, JX 8 § 8.1;

---

difference between them. Jackson was an independent contractor, and both Britton and Jackson held Vice President titles. As discussed below, although Nielsen and Britton formed Sunder with Jackson and the other Co-Founders, they worked with Snell & Wilmer to convert the other Co-Founders' interests into nothing more than a form of incentive compensation.

- Created a manager-managed entity in which Sunder was managed by a Board of Managers consisting only of Nielsen and Britton or their appointees, *id.* §§ 4.1, 4.3;

- Authorized the Board of Managers to approve compensation agreements with selected members "in its sole discretion", *id.* § 5.8;

- Created two classes of member units–Common Units for Nielsen and Britton and Incentive Units for the other Co-Founders, *id.* § 3.4;

- Eliminated voting rights for the Incentive Units, ensuring that Nielsen and Britton exercised 100% of the voting power, *id.* § 3.4(c) ("The Incentive Units have no voting rights.");

- Ensured that the Incentive Units have no consent rights, *id.* ("For the avoidance of doubt, no holder of Incentive Units will have any voting or consenting rights with respect to such Incentive Units in regards to any matter put or brought before the Members . . . .");

- Reiterated yet again that the Incentive Units have no voting or consent rights, *id.* § 15.20 ("but in no event shall a Unit Holder be deemed to have any voting or consent rights . . . .");

- Turned each Minority Member's grant of 8,000 Incentive Units into a combination of 1,600 vested units, with another 1,600 units to vest on each anniversary after that;[23]

- Provided for the automatic forfeiture of any unvested Incentive Units if any holder left Sunder, JX 8 § 3.5;

- Gave Sunder a call option on the Incentive Units for zero dollars per unit if any holder left Sunder without "Good Reason" or was terminated for cause, *id.* § 3.6(b);

- Eliminated informational rights for holders of Incentive Units, *id.* § 9.1;

- Imposed transfer restrictions on the Incentive Units so that they could not be transferred to any third party without Sunder's consent and any transfer would be subject to a right of first refusal in favor of Nielsen and Britton—but not any other Co-Founder, *id.* §§ 11.1–11.3;

---

[23] *See* JX 29. The 2019 LLC Agreement refers to unvested units as "restricted units" and vested units as "released units." *See id.*

- Authorized Nielsen and Britton to drag all of the holders of Incentive Units into a third-party transaction, *id.* § 11.4;

- Granted pre-emptive rights to Nielsen and Britton, but not any other Co-Founder, *id.* § 12.1;

- Provided Nielsen and Britton—but not any other Co-Founder—with broad indemnification and advancement rights, *id.* § 8.2 (extending rights to "Covered Persons," defined to exclude holders of Incentive Units) *id.* § 1.1;

- Recited that all of the signatories made various representations in connection with entering into the 2019 LLC Agreement, *id.* § 15.18; and

- Recited that each party had the opportunity to review the 2019 LLC Agreement with independent legal counsel and that Snell & Wilmer only represented Sunder in connection with the preparation of the document, *id.* § 15.19.

Most significantly for this case, Article XIII of the 2019 LLC Agreement added the Covenants. Article XIII also imposed a contractual confidentiality obligation on the holders of Incentive Units—and only the holders of Incentive Units. *Id.* § 13.3.

Under the 2019 LLC Agreement, the Co-Founders other than Nielsen and Britton (the "Minority Members") went from being co-owners of a single class of equity to powerless holders of nothing more than a form of incentive compensation that a business might offer to line employees. And the 2019 LLC Agreement turned a member-managed LLC structure in which the members owed fiduciary duties to each other into a purely contractarian entity where the only limitations on Nielsen and Britton were what Snell & Wilmer chose to build into the agreement.

Nielsen and Britton sprung the 2019 LLC Agreement on the Minority Members on New Year's Eve, when Nielsen sent the Minority Members an email that attached a .pdf of the 2019 Operating Agreement. JX 10 (the "New Year's Email"). Addressing the Minority Members as "Partners," he wrote:

14

Max [Britton] and I have executed our portion of the Sunder Operating Agreement today and a copy for your review is attached. I will be sending each of you a couple of documents via docusign momentarily. The first one contains your grant of shares and the second one is a joinder agreement that will formally add each of you to the Operating Agreement. If you are married, your spouse will also be sent a spousal consent form. Please let Max or me know if you have any questions.

Lastly, the attorney's [sic] highly recommend completing these documents by the end of tonight, but we don't expect any of you to sign something if you are uncomfortable with it or if you need more clarification from the attorney's [sic] on something. Please let me know if you have any questions.

Happy New Year!

*Id.*

The New Year's Email did not provide any indication that the 2019 LLC Agreement gutted the Minority Members' rights. Nielsen specifically referenced "your grant of shares" without flagging that the Minority Members were only receiving Incentive Units, not the Common Units that he and Britton were receiving. He did not mention that the two classes of equity had diametrically different rights or that the Incentive Units were structured to be nothing more than a form of incentive compensation.

The New Year's Email did not suggest in any way that the Minority Members could not rely on Nielsen and Britton—their "Partners"—as fiduciaries, but rather needed to go into adversarial, arms'-length bargaining mode and negotiate vigorously for themselves. The email also did not suggest in any way that Snell & Wilmer, the firm that was representing all of the Co-Founders in the LGCY Action, was claiming only to represent Sunder for purposes of the 2019 LLC Agreement.

15

Instead, the New Year's Email implied exactly the opposite, namely that signing the 2019 LLC Agreement was something that the Minority Members could get out of the way quickly before continuing with their celebrations. Nielsen observed that he and Britton had already executed the as-circulated copy, and—although it might seem like a small thing—he circulated the document as a .pdf as if it were in final form. He urged the Minority Members to sign that night and told them that "the attorney's [sic] highly recommend completing these documents by the end of tonight." Note the use of the definite article. He did not say "Sunder's attorneys," who were really acting as Nielsen and Britton's attorneys. He said "the attorneys."

Not only that, but Nielsen circulated the signature pages by DocuSign. That meant that the Minority Members did not have to scroll through the 2019 LLC Agreement to reach the end and sign it. They only had to look at a one-page joinder agreement. JX 11; Cohen 84–86.

The Minority Members were all high school graduates who had spent all or most of their careers in the door-to-door sales industry.[24] They were not sophisticated in legal matters. They trusted that Nielsen and Britton—their "Partners"—were representing their collective interests as fellow fiduciaries.[25] Nothing about the email put them on notice that their "Partners" were acting self-interestedly and that the Minority Members needed to protect themselves. Nor is it reasonable to infer on this record that the Minority Members would have understood the traps in the document

---

[24] *See, e.g.*, Jackson 316–21; Ganley 12–14; Sewell 10–11; Cohen 8.

[25] Jackson 334; Sewell 70–72; Ganley 105, 108; Gutschmidt 150.

16

if they had read it. Nielsen testified that his understanding of the document *only* came from his attorneys and that he had *no other understanding* of the agreement, thereby enabling his counsel to invoke privilege. Even Nielsen could not understand the 2019 LLC Agreement without his attorneys' help.

Jackson did as he was asked. He signed the 2019 LLC Agreement barely one hour after receiving the New Year's Email. JX 11.

Nielsen and Britton went even further in 2021, when they amended the LLC Agreement (the "2021 LLC Agreement"). This time, they did not even send a copy to the Minority Members. They simply circulated an email saying that the 2019 LLC Agreement was being amended to add a member and that there were no substantive changes.[26] That was not true: The 2021 LLC Agreement expanded the geographic scope of the Covenants, making them more onerous. *See* JX 13 § 1.1 (definition of "Territory"). But no one had the opportunity to find that out, because Nielsen and Britton only circulated a signature page. JX 14. Other Minority Members could not recall receiving the amended version. Sewell 73; Ganley 171; Gutschmidt 158–59.

Even after radically altering their relationship with the Minority Members, Nielsen and Britton continued to refer to them as "Partners." Testimony from Jackson and other Minority Members in the LGCY action in 2022 shows that they continued to believe that they held equity with the same rights as Nielsen and Britton and had

---

[26]*See* Jackson 421; Glassman 190–91; Sewell 73.

17

no idea that their rights had been altered.[27] Jackson testified to his understanding that the LLC Agreement did not contain any restrictions on his ability to compete with Sunder or solicit its customers or employees. JX 16 at 110. Snell & Wilmer continued to represent the Minority Members, and a Snell & Wilmer attorney defended Jackson's deposition, yet no one from Snell & Wilmer corrected Jackson's misunderstanding.

## D.    The Sunder-Freedom Relationship Blossoms.

From 2019 until the start of 2023, Sunder thrived. Sunder grew into one of Freedom's "super-dealers," generating over 25% of its sales. Freedom supported Sunder's business with administrative services including payroll and commissions calculations. Freedom also supported Sunder with marketing.

Jackson's responsibilities at Sunder grew with the company. His sales group excelled, and he was given direct authority over many of Sunder's key markets, including Texas, Florida, Arkansas, California, and South Carolina. In 2022, Jackson received the title of Vice President and had nearly half of Sunder's sales force reporting to him directly or indirectly. He became the highest paid sales leader at Sunder, earning a total of $4.8 million in compensation over four years. Over the same period, he received a total of $1.2 million in profit distributions from his Incentive Units. But Jackson nevertheless remained an independent contractor with Sunder. His officer title was just that—a title.

---

[27] *See* Sewell 37; JX 15 at 185–86 (Cohen deposition in LGCY action); JX 16 at 109–10, 217–18 (Jackson deposition in LGCY action).

**E.      Nielsen and Britton Make A Series of Business Decisions With Consequences.**

In 2021 and 2022, Nielsen and Britton made a series of business decisions that caused Sunder to encounter difficulties. Those decisions affected Sunder's relationship with Freedom and with its own sales force.

The first issue put a strain on Sunder's relationship with Freedom. Sunder had become sufficiently important to Freedom that the two organizations operated as parts of a single business. Recognizing that reality, Freedom approached Sunder in 2021 with a proposal for an equity swap that would deepen their ties. Nielsen and Britton seemed open to the concept, and Freedom sent Sunder a proposed agreement. In 2022, however, Nielsen and Britton rejected the equity swap. Instead, they hoped to secure a private equity investment. Private equity was pouring billions into the renewable technology industry, buoyed by the Inflation Reduction Act and other government initiatives. Presumably, they hoped to obtain the usual combination of liquidity for themselves and growth capital for the business.

To make Sunder look more attractive to a private equity investor, Nielsen and Britton took steps to increase Sunder's profit margins. One strategy involved using a finance company outside of Freedom's network, but that strategy would have caused Freedom to violate its exclusive agreements with its financing partners, and Freedom vetoed it. The fact that Sunder considered seeking financing elsewhere was another bump in the road for the Sunder-Freedom relationship.

Another strategy was more damaging because it broke trust with Sunder's sales force. When a Sunder representative pitched a deal, Freedom supplied Sunder

with a cost for the installation. To increase Sunder's margins, Nielsen and Britton caused Sunder to pad the installation costs, creating a higher, artificial floor for the deal. When calculating sales commissions and sales leaders' overrides, Sunder used the higher, artificial floor and pocketed the difference between the artificial floor and Freedom's cost.

More money for Sunder meant better financials to show a private equity investor, but it also meant less money in sales commissions and overrides. As a practical matter, the padded installation cost meant that Sunder was taking money from its sales force. Sunder sales representatives eventually discovered that Sunder had secretly changed its calculations and was taking a portion of their money. Not surprisingly, that news went over like a lead balloon and generated feelings of betrayal and distrust.

A final issue was whether Sunder would continue working with Freedom. The initial five-year Dealer Agreement would end in 2024, and a new agreement would need to be renegotiated before then. Freedom had been critical to Sunder's success, and its sales force knew Freedom's products and valued Freedom's industry-leading ability to install systems quickly. At the same time, another exclusive, multi-year deal with Freedom would limit their options. When asked about Sunder's future direction, Nielsen and Britton said that they prioritized working with Freedom, but they would not rule out the possibility that Sunder would go in a different direction.

## F. The Possibility Of Moving To Another Freedom Dealer

By early 2023, the combination of the artificial price floor and the uncertainty about whether Sunder would continue with Freedom were topics of discussion and

debate among Sunder's sales force, and particularly its sales leadership. The sales leaders began questioning whether they should stay with Sunder or move to another Freedom dealer.[28]

One attractive option was Solar Pros, a rapidly expanding dealer that was majority owned by Bouchy, one of Freedom's principals. Freedom was also investing heavily in Solar Pros to build out its network.

Joining Solar Pros was attractive for Sunder's sales professionals because Solar Pros did not have an artificial pricing floor and offered significantly better commissions. In spring 2023, sixty-three Sunder sales professionals moved to Solar Pros. JX. 17.

Jackson was one of the sales leaders who explored the possibility of moving to Solar Pros. In May 2023, Jackson met with Towner and Bouchy at Freedom's headquarters in Las Vegas. Towner and Jackson were best friends; they have known each other for twenty years and started their first company together—an alarm sales company that eventually expanded into solar sales. Because of the close relationship between Sunder and Freedom, Jackson interacted frequently with Towner and Bouchy.

This time, however, the topics of discussion included the possibility of Jackson leaving Sunder and working in some fashion for Freedom or one of its dealers. Immediately after that meeting, Jackson asked Devon Glassman, Sunder CFO, for

---

[28] *See* Towner 93; Armstrong 76–78; Tisdale 61, 137–39; Simmons 51–52; Jackson 374; Wilson 57–59, 63–64,

copies of all of the agreements he had signed with Sunder, evidencing that he was thinking about leaving Sunder.

After learning that he was bound by the Covenants, Jackson felt that his best option was to attempt to preserve the Sunder-Freedom relationship and keep his sales force together. He tried to facilitate meetings between Sunder and Freedom. He also tried to convince his sales leaders not to leave for Solar Pros. But he kept in touch with Towner, communicating with him in late June, early July, and late August.

By this point, Jackson had seven sales managers reporting to him directly. Two of his direct reports—Clayton Granch and Brandon Wilson—were Senior Regional Managers who had Regional Managers who reported to them. Another direct report— Zeke Parker—was a Regional Manager. The four other direct reports were the co-regional managers of two regions. Cory Walksler and Chris Minizzi were one set of Co-Regional Managers. Jeff Roman and Jed Sewell were the other set of Co-Regional Managers. The following chart shows the reporting structure. The individuals identified in red left Sunder for Solar Pros between September 11 and 19, 2023.



During the same period, Nielsen and Britton were keeping their options open. In June and July 2023, they began having meetings with other solar installers. In August 2023, they hired counsel to evaluate Sunder's rights under the Dealer Agreement.

Sunder's sales leaders knew what Nielsen and Britton were doing, and they became even more concerned. One sales leader who was particularly frustrated was Granch, one of the two Senior Regional Managers who reported directly to Jackson and who had two Regional Managers, Jason Tisdale and Josh Simmons, who reported to him. Granch was deeply offended by Nielsen and Birtton's secret implementation of the artificial pricing floor, and he no longer trusted Nielsen. Earlier in the year, Jackson had connected Granch with Towner so Granch could learn about his options. *See* PX 16 at '969.

During August 2023, Granch had a blunt yet professional call with Nielsen, Britton, and Jackson in which he explained that he did not see how he could ever trust Nielsen again. After Nielsen reacted by asking why he should not fire Granch on the spot, Jackson succeeded in restoring calm. FX 7.

Nielsen then explained that Sunder's "main focus is extending with Freedom." *Id.* He acknowledged, however, that if they could not reach a deal with Freedom, then they would have to look to other installers. Nielsen also acknowledged that if that happened, then it would have "ramifications" for Sunder in terms of losing sales personnel who wanted to continue working with Freedom. *Id.* Granch then made clear to Nielsen, Britton, and Jackson that if Sunder did not stay with Freedom, then he would not remain with Sunder. *Id.*

At the end of August 2023, Towner and Bouchy spoke with Jackson about working for Solar Pros. PX 9 at 12. They began working on a new strategy under which in return for a multi-million-dollar payment from Freedom, Sunder would release Jackson from the Covenants and facilitate a transition of Jackson's sales organization to Solar Pros. Jackson communicated with Freedom management about the strategy, and he sent Freedom's general counsel a copy of the 2021 Operating Agreement so that Freedom could evaluate the Covenants. *See* JX 20; JX 21; PX 54; PX 55; Jackson 154–57.

During early September 2023, Granch had a heartfelt, late-night talk with Jackson about his frustrations with Sunder. At one point, Granch asked Jackson what he would do if he were in Granch's position and did not have a do-not-compete

24

obligation. Jackson responded, "If I didn't have a [do-not-compete], I'd have made my decision months ago."[29] For Granch, Jackson's statement was "a sign." PX 17 at '953. He decided he would take his group to Solar Pros.

## G. The Las Vegas Meeting

With Jackson's support, Freedom requested a meeting between the two senior management teams at Freedom's headquarters in Las Vegas. JX 21. The meeting was scheduled for September 14, 2023. On September 11, 2023, three days before the meeting, Granch signed an independent contractor agreement with Solar Pros. Granch 29. The two regional managers who reported to him—Jason Tisdale and Josh Simmons—signed agreements with Solar Pros on September 12. Granch then texted Towner to tell him that his group was prepared to resign from Sunder *en masse* and move to Solar Pros. *See* PX 17. But Towner asked him to wait until after the Las Vega meeting, lest the resignations cause Sunder to cancel the meeting. PX 12; PX 19 at '038. Anticipating that they would be leaving for Solar Pros, Granch's group began sitting on deals so that they could sign them up through Solar Pros rather than through Sunder. *See* PX 20. Granch told Tisdale that the meeting "would've had to go perfect to change our direction tomorrow anyway. If sunder sits back and says thanks for the info we need to think about it, we're still gone." *Id.* at '034.

---

[29] *See* PX 17 at '953; (Granch describing conversation to Tisdale); *see* Granch 161–62 (describing conversation); Jackson 418–19 (same).

The September 14 meeting went forward as scheduled. The attendees were Nielsen and Britton from Sunder, and Towner, Bouchy, and Freedom's general counsel from Freedom. Britton took handwritten notes. JX 22.

During the meeting, Freedom offered to pay $10 million in exchange for Sunder's agreement to release Jackson from the Covenants and to facilitate the transfer of "his group" to Solar Pros. Freedom also asked for a global release of all of the previous claims that Sunder had made against Freedom, but after Sunder objected, Freedom signaled that it was willing to give up on that point. Freedom also proposed to pay 25% of the $10 million up front, followed by $1 million per month until the amount was fully paid. Sunder countered by asking for one-third at signing, one-third in forty-five days, and one-third in ninety days. *Id.*

The parties did not reach an agreement, but they also did not seem that far apart. Britton noted that to proceed with the deal, they needed a "list of Tyler's people – scrub and report back." *Id.* That appears to be a reference to generating a list of all of the people in Tyler's group, which everyone would review to determine who would transition to Solar Pros.

During the meeting, Towner gave real time updates to Granch. After hearing that Nielsen and Britton seemed receptive to Freedom's proposal, Granch texted Jackson and Towner, telling them to call him "catalyst clay." PX 18. Granch then called and texted his team to tell them that they would not be resigning, because "[i]n the next 48 hours [t]here will be a joint public announcement between freedom and sunder that they are amicably releasing Tyler Jackson and his entire org to go to

26

Solar Pros effective immediately." PX 19 at '039. He wrote, "WE WERE THE CATALYST! We helped sunder and freedom reach this peaceful transition and I couldn't be more proud of us." *Id.*

After hearing the news, Jackson circulated a list of Sunder personnel to three of his direct reports: Granch, his other Senior Regional Manager Brandon Wilson, and a third Regional Manager Zeke Parker. PX 15. The list was an initial effort to identify who would join him at Solar Pros. *See* Granch 96; Jackson 170–73.

Within days after the Las Vegas meeting, the dominos began to fall. Granch, Tisdale, and Simmons had already signed agreements with Solar Pros. They formally resigned on September 16, 2022. *See* JX 23. Parker resigned sometime between September 16 and 19. Wilson and his Regional Managers left by September 21.

After the Las Vegas meeting, Jackson had frequent discussions with Towner and Bouchy about transitioning to Solar Pros. Jackson and his team also began making calls and traveling to meet with leaders of sales teams to find out if they wanted to join Solar Pros. *See* PX 21. In his interrogatory response, Jackson identified thirty-seven Sunder representatives that he spoke with about his anticipated role with Solar Pros. PX 9. On September 20, Jackson traveled to Tampa, Florida, and met with two Sunder sales representatives whom he hoped would join him at Solar Pros. *Id.* On September 21, Jackson sent an audio file to Wilson and the leaders in his group, telling them that he had finished about nine hours of meetings with three Sunder sales representatives and thought he had "all three of them locked down" to join Solar Pros. JX 24.

27

The defendants claim that Jackson took these steps because coming out of the Las Vegas meeting, one of his tasks was to determine who from "his group" would join him. Sunder asserts that there was no agreement, and that Jackson was soliciting Sunder personnel in violation of the Covenants.

At this stage of the case, the stronger interpretation of the contemporaneous evidence favors Sunder's position. For example, on September 16, 2023, Britton texted Jackson and asked why he was so quiet, noting: "Your division is being ripped apart and you didn't reach out to us at all to help." JX 26. Jackson replied by asking whether there was any chance of undoing Granch's move to Solar Pros, as if Jackson intended to stay. He also spoke of attempting to keep another group at Sunder and stressed that he had been trying to prevent departures from happening. *Id.* That is inconsistent with an account in which Jackson was tasked with identifying who wanted to leave and planning for a transition.

It was not until September 18, 2023, that Freedom sent Sunder a draft settlement agreement. PX 45. Freedom accepted Sunder's counterproposal on the timing of the payments. PX 46. Sunder has claimed that the agreement contained an objectionable release of all claims, but none appears in the draft agreement. *Id.*

The next day, Towner sent a spreadsheet labeled "9.14.23 Sunder Region Jackson" to Nielsen, Britton, Jackson, and Devon Glassman, Sunder's Chief Financial Officer. The defendants have claimed that the purpose of sending the list was to identify the sales representatives who would be covered by the separation offer and join Jackson at Solar Pros. JX 7 at 10. Towner generated the list from Freedom's

own internal information, because Freedom had the necessary information as a result of the administrative support that it provided to Sunder.

For the preceding five days, however, Jackson had been working hard to recruit his team to join Solar Pros. *See* PX 23; PX 24. On September 20, 2023, the head of Solar Pros, Kiley Powell, wrote: "All of Tyler's teams were transferred to the Pros portal last night and into the morning." PX 22 at '483. Powell identified "[t]hose . . . that are coming with Tyler" as Clayton Granch, Brandon Wilson, Zeke Partner,and Jeff Roman. *Id.* at '484. Those were four of Jackson's seven direct reports.

## H.    Jackson Joins Solar Pros.

On September 22, 2023, four hours *before* he resigned from Sunder, Jackson signed an independent consulting agreement with Freedom Solar Pros LLC, an affiliate of Freedom and Solar Pros. JX 30. The agreement has a term of two years and will automatically renew annually unless terminated. Under the agreement, Jackson is entitled to compensation of $120,000 per year. *Id.* § 3.1. In return, Jackson committed to provide Freedom and Solar Pros with services that would compete with Sunder's business, including "[r]eferrals of sales professionals." *Id.* at 10. Somewhat ironically given the issues in the case, the agreement restricts Jackson from soliciting any personnel of the Company during the term of the agreement or for twelve years after its termination. *Id.* § 11.

In the agreement, Freedom Solar Pros agreed to indemnify Jackson and hold him harmless against,

> [a]ny claims brought by Consultant's former company, [Sunder], arising
> out of of Consultant's engagement with and/or employment for, Freedom
> Forever LLC and/or Company (collectively "**Sunder Litigation**"),

29

including but not limited to claims brought under Section 13.1 of [the 2021 LLC Agreement]. Company shall pay for any settlement entered of judgment obtained against Consultant in the Sunder Litigation.

*Id.* § 15.2(d)

On the evening of Friday, September 22, 2023, Jackson submitted his resignation. Freedom decided to wait to make a public announcement about Jackson's hiring until Monday, September 25, 2023. PX 25 at '461. Jackson responded, "Hell yes! Super excited and grateful." *Id.* at '462.

Over the weekend, Jackson "locked down one of Florida[']s top managers" for Solar Pros. PX 27 at '390. He spoke to a sales representative from Zeke Parker's region about joining Solar Pros. PX 28. He also offered to talk to a group in Los Angeles on Freedom's behalf, saying "I have a really good relationship with those guys" and "I can get them if they want to talk." PX 58.

On September 25, 2023, Solar Pros posted a picture of Jackson on its Instagram page that announced him joining as president. After seeing the post, Nielsen emailed Jackson and noted that although Sunder was "in the process of negotiating a potential separation agreement that may release you from your contractual obligations to Sunder," no agreement had been reached yet. JX 28. Nielsen asked Jackson to immediately publish a retraction, otherwise Sunder "will need to take other appropriate action." *Id.* Nielsen also noted that "by resigning, you have automatically forfeited" his unvested Incentive Units and that Sunder had the right to repurchase his vested Incentive Units for $0 per unit. *Id.*

Jackson continued recruiting for Solar Pros. On September 26, 2023, he was on a plane to Alaska to meet with a sales team, then later in the week he flew to Las

Vegas to help Solar Pros with a sales kickoff. PX 60. He continued to work with other Solar Pros representatives on recruiting Sunder personnel. JX 61.

## I.     This Litigation

On September 29, 2023, Sunder launched a two-pronged response. First, Sunder terminated the Dealer Agreement with Freedom for cause and filed an arbitration to enforce its rights. Second, Sunder filed this action against Jackson, Freedom, Bouchy, Towner, Freedom Solar Pros, and Solar Pros. Dkt. 1. Sunder filed an amended verified complaint on October 3. Dkt. 9. Meanwhile, Jackson continued his efforts to recruit Sunder personnel to Solar Pros. *See* PX 31–33; PX 35. On October 3, Jackson participated in a call with a Sunder representative and Towner during which Towner offered Walksler $200,000 to join Solar Pros. PX 9 at 15.

On October 4, 2023, Jackson circulated a Google document to multiple Solar Pros representatives in a group titled "Gotta catch 'em all." The document identified Sunder sales professionals to recruit. *See* PX 36, 37; Jackson 241. Hours later, the court issued an *ex parte* temporary restraining order based on the verified allegations of the complaint. The TRO was intended to preserve the status quo pending a hearing on whether to renew or lift the order, which would take place on or before October 18. Dkt. 10. Ninety minutes later, Jackson sent an audio message to the "Gotta catch 'em all" group in which he told them that he was "going to need to lay low for a bit" and that they should request access to the Google document so they could continue his work. PX 38. The group participants understood his instructions and began going through the list to recruit the people on it.

The parties briefed whether the court should allow the TRO to expire or renew it, and the defendants moved to dismiss the case in favor of arbitration under the Dealer Agreement. On October 11, 2023, after a hearing held on the preceding day, the court renewed the TRO. Dkt. 52.

Over the following month, the parties engaged in expedited discovery in preparation for a hearing on Sunder's motion for a preliminary injunction. That hearing took place on October 17, 2023.

## II.     THE PROCEDURAL STANDARD

Sunder seeks a preliminary injunction enjoining Jackson, and any person or entity acting in concert with him, from taking actions in breach of the Covenants.

> When seeking a preliminary injunction, a plaintiff must demonstrate a reasonable probability of success on the merits and that some irreparable harm will occur in the absence of the injunction. Furthermore, in evaluating the need for a preliminary injunction, the Court must balance the [moving party's] need for protection against any harm that can reasonably be expected to befall the [non-moving party] if the injunction is granted.[30]

"Delaware cases often describe the issuance of a preliminary injunction as 'extraordinary relief,' but not in the colloquial sense of amazing, astonishing, miraculous, or incredible."[31] The remedy is extraordinary in the sense of out of the ordinary, because, in the ordinary course of a case, a court does not grant relief until after a final adjudication. "A preliminary injunction departs from the ordinary course

---

[30] *Mills Acq. Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1278–79 (Del. 1989) (internal citation omitted).

[31] *In re COVID-Related Restrictions on Religious Servs.*, 285 A.3d 1205, 1227 (Del. Ch. 2022).

32

of a case because the court grants relief at a preliminary stage, based on a preliminary record." *Id.*

Delaware decisions often frame the standard for a preliminary injunction as requiring proof of three elements: "(i) a reasonable probability of success on the merits; (ii) a threat of irreparable injury if an injunction is not granted; and (iii) that the balance of the equities favors the issuance of an injunction."[32] "The party seeking a preliminary injunction must demonstrate all three elements to prevail, but once proven by the plaintiff the three elements are considered together by the court in determining whether to issue a preliminary injunction."[33] The court is not required to weigh the elements equally, and a strong showing in one element can compensate for a weaker showing on another. *Id.*

The first element—a reasonable probability of prevailing on its claims—requires a showing that falls "well short of that which would be required to secure final relief following trial."[34] At trial in a civil case, a plaintiff generally must prove its claims by a preponderance of the evidence.[35] At the injunction phase, a party must demonstrate that it has a reasonable probability of meeting that standard.

---

[32] *In re New Maurice J. Moyer Acad., Inc.*, 108 A.3d 294, 311 (Del. Ch. 2015) (citing *Revlon, Inc. v. MacAndrews & Forbes Hldgs., Inc.*, 506 A.2d 173, 179 (Del.1986)).

[33] *Abrons v. Maree*, 911 A.2d 805, 810 (Del. Ch. 2006).

[34] *Cantor Fitzgerald, L.P. v. Cantor*, 724 A.2d 571, 579 (Del.Ch.1998).

[35] *E.g., JER Hudson GP XXI LLC v. DLE Inv'rs, LP*, 275 A.3d 755,782 (Del. Ch. 2022).

The second element—immediate, discernible harm for which there is no adequate remedy at law—is the "sine qua non of preliminary injunctive relief."[36] The threatened harm must occur "between now and trial unless an injunction issues." *Id.* That timing requirement recognizes that the purpose of a preliminary injunction is to preserve the status quo so that the court can hold a trial, make findings of fact, render conclusions of law, and issue a remedy. If no irreparable harm will occur before a trial, then there is no need for the court to act before the remedial phase.[37]

Finally, the Court of Chancery "has discretion to grant or deny an application for injunctive relief in light of the relative hardships of the parties."[38] Sunder must show that "failure to grant the injunction will cause Plaintiff greater harm than granting the injunction will cause Defendants." *Id.*

Sunder's application fails on the first element of the injunction standard. Because Sunder has not carried its burden, a preliminary injunction will not issue. That does not mean that Sunder's application does not have other shortcomings. It only means that this decision need not address them.

---

[36] *Kingsbridge Cap. Gp. v. Dunkin' Donuts Inc.*, 1989 WL 89449, at *4 (Del. Ch. Aug. 7, 1989).

[37] *COVID-Related Restrictions*, 285 A.3d at 1228.

[38] *Bernard Pers. Consultants, Inc. v. Mazarella*, 1990 WL 124969 at *2 (Del. Ch. Aug. 28, 1990).

## III.  THE REQUEST FOR A PRELIMINARY INJUNCTION AGAINST JACKSON

Sunder contends that Jackson has breached the Competition Restriction and the Personnel Restriction. Sunder asserts that unless the court issues an injunction, Jackson will continue to breach the Covenants. Sunder asks for a preliminary injunction enforcing the Covenants pending a final determination after trial.

### A.  A Reasonable Likelihood Of Success On The Claim For Breach Of The Covenants

Sunder's claim for breach of the Covenants is a claim for breach of contract. The elements of a claim for breach of contract are "(i) a contractual obligation, (ii) a breach of that obligation by the defendant, and (iii) a causally related injury that warrants a remedy, such as damages or in an appropriate case, specific performance."[39] Restrictive covenants are enforceable when they are (i) valid under general principles of law, (ii) are reasonable in their scope and effect, (iii) bear a reasonable relationship to the advancement of legitimate interests, and (iv) survive a balancing of the equities.[40]

Sunder cannot establish a reasonable likelihood of success on the merits because Sunder cannot point to a valid contractual obligation. The Covenants as a whole are not enforceable under general principles of law, and two Covenants on which Sunder relies—the Competition Restriction and the Personnel Restriction—

---

[39] *AB Stable VIII LLC v. Maps Hotels & Resorts One LLC*, 2020 WL 7024929, at *47 (Del. Ch. Nov. 30, 2020), *aff'd*, 268 A.3d 198 (Del. 2021).

[40] *See TriState Courier & Carriage, Inc. v. Berryman*, 2004 WL 835886, at *10 (Del. Ch. Apr. 15, 2004).

are not reasonable in their scope and effect. Because those issues are dispositive, this decision does not consider the other requirements that a restrictive covenant must satisfy, nor the other elements of a claim for breach of contract. Sunder's application faces challenges on other elements, but this decision need not reach them.[41]

### 1.     Choice Of Law For The Covenants

As a threshold matter, the court must determine what law governs the Covenants. They appear in the 2021 LLC Agreement, which governs the internal affairs of a Delaware LLC. The 2021 LLC Agreement also provides explicitly that Delaware law governs its terms. PX 7 § 15.11. Normally, that combination would trigger the application of Delaware law, both under the internal affairs doctrine and as a matter of contract.

---

[41] Causation is one serious impediment. According to Freedom and Jackson, the Sunder representatives left because Nielsen and Britton had committed a series of own goals by (i) establishing an artificial cost floor to increase Sunder's profitability, albeit at the cost of the sales professionals losing trust in Sunder's management team, (ii) taking action that put a strain on Sunder's relationship with Freedom, such as rejecting Freedom's proposal for an equity swap and seeking to use financing sources outside of Freedom's network, and (iii) actively considering using installers other than Freedom, which Nielsen acknowledged would have serious repercussions for Sunder's sales force. During the hearing on the preliminary injunction, Freedom offered video testimony from former Sunder sales representatives who testified about their decision to leave Sunder and the extent to which Jackson had influenced them. To a man, they testified that factors other than Jackson drove their decision. *E.g.*, Granch 140, 159–60; Towner 46–47; Tisdale 130–34; Parker 94–95; Armstrong 75; *see* FX 16. Each seemed credible, but the court only saw short clips. Not only that, but there is contemporaneous evidence in the record indicating that Jackson did influence departure decisions. At a minimum, Jackson influenced Granch, who interpreted Jackson's statement that if he were not subject to the Covenants, then he would have made his decision months ago, as a sign that he should leave Sunder and join Solar Pros. It is also clear that Jackson did engage in extensive solicitation efforts, both before and after leaving Sunder, and that Jackson thought in real-time that his involvement had an effect. His senior managers thought so too. To parse causation ultimately will require difficult credibility assessments and a careful weighing of the evidence.

In this case, however, the drafters of the 2021 LLC Agreement are attempting to use Delaware law to govern the relationship between Sunder and one of its independent contractors, who also happened to be its head of sales. This is not a case in which the drafters of the 2021 LLC Agreement are addressing a quintessentially internal dimension of an entity's affairs. Instead, this is an example of drafters attempting to use Delaware law to set the rules for what are effectively employment relationships. Other jurisdictions often have a more significant interest in regulating those relationships, which affect how their citizens living there can earn a living and how a business operating there can compensate its work force.

Delaware follows the Restatement (Second) of Conflict of Laws, and Delaware courts consequently will not enforce choice of law provisions when doing so would circumvent the public policy of another state that has a greater interest in the subject matter.[42] Consequently, when a different state's law would govern in the absence of a choice of law provision, and if that state has established legal rules reflecting a different policy toward restrictive covenants than Delaware's, then this court will defer to that state's law notwithstanding the presence of a Delaware choice of law provision.[43]

---

[42] *Cabela's LLC*, 2018 WL 5309954, at *7–10; *Ascension Ins. Hldgs., LLC v. Underwood*, 2015 WL 356002, at *2–3 (Del. Ch. Jan. 27, 2015).

[43] *HighTower Hldg., LLC v. Gibson*, 2023 WL 1856651, at *5 (Del. Ch. Feb. 9, 2023); *FP UC Hldgs., LLC*, 2020 WL 1492783, at *8; *Cabela's*, 2018 WL 5309954, at *7–10; *Ascension*, 2015 WL 356002, at *2–5.

In this case, the law of either Utah or Texas would apply absent the choice of law clause. Sunder is headquartered in Utah, and Jackson lives and works in Texas. The question then becomes whether Utah or Texas approaches restrictive covenants differently than Delaware. Both do, but only to a marginal degree.

Utah's standard for enforcing a restrictive covenant generally parallels the Delaware test. Under Utah law, a covenant not to compete is enforceable if "(1) the covenant is supported by consideration; (2) no bad faith is shown in the negotiation of the contract; (3) the covenant is necessary to protect the goodwill of the business; and (4) it is reasonable in its restrictions as to time and area."[44] By statute, however, Utah provides that post-employment restrictive covenants cannot last for a period of more than one year from the day on which the employee is no longer employed by the employer. Utah Code § 34-51-201(1). A restrictive covenant that violates that statutory limit is void. *Id.* Under Utah law, therefore, all of the Covenants are void, because all last more than one year.

Texas has enacted a statute that governs restrictive covenants.[45] Under its terms,

> a covenant not to compete is enforceable if it is ancillary to or part of an otherwise enforceable agreement at the time the agreement is made to the extent that it contains limitations as to time, geographical area, and scope of activity to be restrained that are reasonable and do not impose

---

[44] *Vendr, Inc. v. Tropic Techs., Inc.*, 2023 WL 3851838, *6 (D. Utah June 6, 2023) (citing *System Concepts v. Dixon*, 669 P.2d 421, 425–26 (Utah 1983)).

[45] *Forum US, Inc. v. Musselwhite*, 2020 WL 4331442 (Tex. App. July 28, 2020) (citing Tex. Bus. & Com. Code §§ 15.50–52).

a greater restraint than is necessary to protect the goodwill or other business interest of the promisee.

Tex. Bus. & Com. Code § 15.50(a). That provision generally parallels Delaware's test, while making explicit the requirement that a restrictive covenant "not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee." Unlike Delaware, however, the Texas statute requires blue-penciling.

> [T]he court shall reform the covenant to the extent necessary to cause the limitations contained in the covenant as to time, geographical area, and scope of activity to be restrained to be reasonable and to impose a restraint that is not greater than necessary to protect the goodwill or other business interest of the promisee and enforce the covenant as reformed.

*Id.* at § 15.51(c). Under Texas law, therefore, the court would be required to blue-pencil the Covenants and enforce them to a reasonable degree.

Sunder has asked the court to apply Delaware law, not Texas law. Thus, even though Sunder would fare better under Texas law, the court will respect its choice. Jackson would have a stronger case for invalidity under Utah law, but because the Covenants are invalid under Delaware law, the conflict is a false one, and the court can apply Delaware law. This decision therefore analyzes the Covenants under Delaware law.

### 2. Lack of Enforceability Under General Principles of Law

Sunder cannot obtain a preliminary injunction because the Covenants are not enforceable under general principles of law. The record establishes that Nielsen and Britton breached their fiduciary duty of disclosure when seeking member approval for the 2019 LLC Agreement and the 2021 LLC Agreement. The terms of the 2019

LLC Agreement and the 2021 LLC Agreement were therefore never validly approved, and it would be inequitable to permit Nielsen and Britton to enforce those provisions now. Although a claim challenging the 2019 LLC Agreement likely would be untimely, timeliness principles apply differently to affirmative defenses.[46]

### a. Lack Of Enforceability Due to Breach of Duty

By default under the LLC Act, a Delaware LLC has a member-managed governance structure with strong functional and historical ties to the general partnership, albeit with limited liability for members.[47] By default, members under

---

[46] Because this issue is dispositive, the court does not reach Jackson's other arguments against enforceability under general principles of law. Those arguments, however, face conceptual difficulties. Jackson contends that the Minority Members did not receive any consideration for entering into either the 2019 LLC Agreement and the 2021 LLC Agreement, and that is likely true. Both agreements, however, amended Sunder's then-existing LLC agreement. When the appropriate internal entity organs act in compliance with the governing law and any applicable duties to amend an entity's governing document, it is far from clear that consideration is required for the amendment. A charter amendment, for example, amends the certificate of incorporation—also an internal governance document that is interpreted using contractual principles—but our law does not require that stockholders receive consideration for the amendment in the traditional contractual sense. *See* 8 *Del. C.* § 242. The same principle should apply to an amendment to an LLC agreement. *But see Peco Logistics, LLC v. Walnut Inv. P'rs, L.P.*, 2015 WL 9488249, at *7–8 (Del. Ch. Dec. 30, 2015) (holding that an alleged oral amendment to an LLC Agreement could not be effective where it lacked consideration). Jackson also contends that the 2019 LLC Agreement was procured by fraud, but in a counterfactual world where the parties had no pre-existing entity-based relationship and were bargaining at arm's-length over the terms of an LLC agreement, it seems unlikely that anything in the New Year's Email constituted an affirmatively misleading statement or materially misleading omission sufficient to support a claim for common law fraud. The viability of Jackson's defense depends on the duty of disclosure that Nielsen and Britton owned as fiduciaries, either in their capacities as members of a flat, partnership-like, member-managed LLC, or as the managing members in a manager-managed LLC.

[47] See 6 *Del. C.* § 18–402 (establishing the default rule that management of an LLC is "vested in its members in proportion to the then current . . . interest of members in the profits of the limited liability company owned by all of the members," with the decision of members owning a majority of such profit interest controlling); *Domain Assocs., L.L.C. v. Shah*, 2018 WL 3853531, at *14 (Del. Ch. Aug. 13, 2018) (explaining parallels between the default,

40

a member-managed governance structure are managers, and they therefore owe fiduciary duties to the entity and to each other, just like partners in a general partnership.[48]

The fiduciary obligations of managers and managing members include a duty of disclosure. That obligation is not a separate duty, but rather a contextual manifestation of the duties of care and loyalty.[49] Fiduciaries owe a duty of disclosure when, for example, fiduciaries ask their beneficiaries to take action: "When fiduciaries communicate with their beneficiaries in the context of asking the beneficiary to make a discretionary decision—such as whether to consent to a sale of substantially all the assets of an LLC—the fiduciary has a duty to disclose all material facts bearing on the decision at issue."[50] That duty applies when fiduciaries

---

member-managed structure and general partnership); *Obeid v. Hogan*, 2016 WL 3356851, at *6 (Del. Ch. June 10, 2016) (same); *Kelly v. Blum*, 2010 WL 629850, at *11 n.73 (Del. Ch. Feb. 24, 2010) (identifying parallel between member-managed LLC and partnership). As in a general partnership, the LLC Act's "default framework generally contemplates a unity of membership and management control." Robert L. Symonds, Jr. & Matthew J. O'Toole, *Delaware Limited Liability Companies* § 9.01[A][1], at 9–5 (2d ed. 2019).

[48] 6 *Del. C.* § 18-1104 ("In any case not provided for in this chapter, the rules of law and equity, including the rules of law and equity relating to fiduciary duties and the law merchant, shall govern."); *Feeley v. NHAOCG, LLC*, 62 A.3d 649, 662 (Del. Ch. 2012) (explaining that managing members and managers owe fiduciary duties by default under the LLC Act).

[49] *Malpiede v. Townson*, 780 A.2d 1075, 1086 (Del. 2001).

[50] *Bakerman v. Sidney Frank Imp. Co.*, 2006 WL 3927242, at *14 (Del. Ch. Oct. 10, 2006); *accord Bay Ctr. Apartments Owner, LLC v. Emery Bay PKI, LLC*, 2009 WL 1124451, at *11 (Del. Ch. Apr. 20, 2009) (explaining that the fiduciary duty of disclosure "applies by analogy to the fiduciaries of an LLC when they seek members' consent.").

ask that members approve an amendment to an LLC agreement.[51] And a fiduciary also cannot make misleading, partial disclosures. A fiduciary that chooses to speak must do so candidly and completely.[52] The disclosures must cover the subject on which the fiduciary chooses to speak "in a manner that is materially complete and unbiased by the omission of material facts."[53] Even if the additional information independently would fall short under the traditional materiality standard, it must be disclosed if necessary to prevent other disclosed information from being misleading.[54]

Those duties apply to fiduciaries in privately held entities.[55] "What changes is not the underlying duty but rather the context-dependent analysis of what information is material."[56]

When Nielsen and Britton solicited the Minority Members' approval for the 2019 LLC Agreement, they owed a fiduciary duty to disclose fully and fairly all material information, as well as a duty not to make misleading partial disclosures.

---

[51] *Cf. Stroud v. Grace*, 606 A.2d 75, 84 (Del. 1992) (discussing duty of disclosure in connection with charter amendment).

[52] *Zirn v. VLI Corp.*, 681 A.2d 1050, 1056 (Del. 1996).

[53] *In re Pure Res., Inc., S'holders Litig.*, 808 A.2d 421, 448 (Del. Ch. 2002).

[54] *Johnson v. Shapiro*, 2002 WL 31438477, at *4 (Del. Ch. Oct. 18, 2002).

[55] *New Enter. Assocs. 14, L.P. v. Rich*, 292 A.3d 112, 147 (Del. Ch. 2023).

[56] *Kurz v. Holbrook*, 989 A.2d 140, 183 (Del. Ch. 2010), *aff'd in part, rev'd in part on other grounds sub nom. Crown EMAK P'rs, LLC v. Kurz*, 992 A.2d 377 (Del. 2010); *see Kerbawy v. McDonnell*, 2015 WL 4929198, at *12 (Del. Ch. Aug. 18, 2015) (acknowledging that directors of a privately held company owe a duty of full disclosure when soliciting consents); *eBay Domestic Hldgs., Inc. v. Newmark*, 16 A.3d 1, 31 (Del. Ch. 2010) ("Fiduciary duties apply regardless of whether a corporation is 'registered and publicly traded, dark and delisted, or closely held.'" (quoting *Kurz*, 989 A.2d at 183)).

Nielsen and Britton were not acting as arm's-length counterparties in a negotiation of a contract. The Co-Founders had formed Sunder in August 2019. Under the oral operating agreement that existed at formation, they were all members owning a single class of member units. Even assuming that the Co-Founders agreed that Nielsen and Britton would be managing members rather than simply managers in the colloquial sense, Nielsen and Britton still owed fiduciary duties.

As described in the Factual Background, the 2019 LLC Agreement was an astoundingly one-sided document, stacked with provisions drafted in Nielsen and Britton's favor. Every one of the eighteen changes highlighted in the Factual Background should have been called out for the Minority Members. If Nielsen did not feel competent to do that himself in the New Year's Email, he needed to ask Snell & Wilmer to prepare a written summary. Or he could have asked Snell & Wilmer to provide the Minority Members with the type of oral presentation that he and Britton received.

At the very least, Nielsen and Britton had an obligation to state plainly to the Minority Members that it was time to switch out of a mindset of fiduciary reliance and into a mindset of arm's-length bargaining. They were obligated to put the Minority Members on notice that this was a really big deal. They needed to say, in substance, that the 2019 LLC Agreement materially and adversely altered the Minority Members' rights, that Snell & Wilmer represented Sunder and its controlling members (*viz.*, Nielsen and Britton) and not the Minority Members, and

that the Minority Members should retain their own counsel and obtain independent advice because there were major changes in the draft agreement.

Instead, the New Year's Email sought to reassure the Minority Members and induce them to sign the 2019 LLC Agreement.

- Nielsen addressed the Minority Members as "Partners."

- Nielsen sent the document on New Year's Eve.

- Nielsen noted that he and Britton had already executed the agreement, as if it were a done deal.

- Nielsen provided a copy for the Minority Members to review, but sent it as a .pdf, as if no changes were expected or welcome.

- Nielsen wrote that "the attorney's [sic] highly recommend completing these documents by the end of tonight," without noting that Snell & Wilmer—the attorneys—were not representing the Minority Members in connection with the 2019 LLC Agreement.

Sunder has stressed Nielsen's superficially accommodating coda that "we don't expect any of you to sign something if you are uncomfortable with it or if you need more clarification from the attorney's [sic] on something. Please let me know if you have any questions." That was masterful understatement, and it was hardly sufficient to put the Minority Members on notice of the monumental changes that the 2019 LLC Agreement made to their rights. More importantly, it fell far short of the type of warning necessary to inform the Minority Members that their ostensible fiduciaries were operating in adversarial, arm's-length bargaining mode. Scholars conducting empirical research have found that statements of this type—and even affirmative disclosures of conflicts—often lead the recipient to trust the counterparty

44

more, reasoning that the statement is evidence of trustworthiness.[57] One need not delve into that research to perceive that Nielsen's statement was designed to reassure the Minority Members, not put them on their guard.

Nielsen and Britton also did not make any oral disclosures to the Minority Members that might have supplied the information so obviously omitted from the New Year's Email. They said nothing to the Minority Members about the contents of the 2019 LLC Agreement, and they could not have reasonably expected the Minority Members to read, understand, and evaluate its terms. For starters, providing the agreement was not enough to fulfill their fiduciary duty of disclosure. They could not simply provide a lengthy, dense document and say, "have at it." Not only that, but Nielsen testified consistently that his understanding of the 2019 LLC Agreement came exclusively from his attorneys. In other words, the sender of the New Year's Email could not understand the 2019 LLC Agreement without having Snell & Wilmer lawyers explain it to him. He could hardly expect the Minority Members to do what he could not.

As noted in the Factual Background, Nielsen and Britton did not cure the situation with the 2021 LLC Agreement. When they asked the Minority Members to consent to that amendment, they did not even circulate a copy of the agreement. They merely told the Minority Members—inaccurately—that the amendment did not make

---

[57] *E.g.*, Daylian M. Cain, George Loewenstein & Don A. Moore, *The Dirt on Coming Clean: Perverse Effects of Disclosing Conflicts of Interest*, 34 J. LEG. STUD. 1, 5–7, 12–14, 17 (2005); Daylian M. Cain, George Loewenstein & Don A. Moore, *When Sunlight Fails to Disinfect: Understanding the Perverse Effects of Disclosing Conflicts of Interest*, 37 J. CONSUMER RSRCH. 836, 849–51 (2011).

any material changes. The amendment expanded the scope of the Covenants' geographic coverage.

The record demonstrates that the Minority Members had no idea what Nielsen and Britton had accomplished. When questioned about their rights under the 2021 LLC Agreement and then confronted with its actual terms, the Minority Members consistently evidenced shock and surprise about what the agreement said. And that testimony came from Minority Members aligned with Nielsen and Britton.[58]

Even at this preliminary stage, it is clear as a matter of law that Nielsen and Britton breached their fiduciary duty of disclosure in connection with the 2019 LLC Agreement and 2021 LLC Agreement. Nielsen and Britton therefore cannot enforce the terms of the 2021 LLC Agreement against Jackson.

### b. The Untimeliness Argument

With Jackson relying on a breach of duty in December 2019 to defeat a claim in September 2023, the obvious response is to challenge the defense as untimely. To be timely, a fiduciary challenge ordinarily must be asserted within three years of the wrong. Tolling doctrines may extend the timeliness period, but not when a potential plaintiff is on inquiry notice.[59] The standard for evaluating inquiry notice is more lenient than the standard for evaluating compliance with the duty of disclosure, so the inadequacies of the New Year's Email would not be dispositive. Having received

---

[58] *E.g.*, Gutschmidt 108, 162–63**;** JX 15 at 185–86 (Cohen LGCY deposition).

[59] *Ont. Provincial Council of Carpenters' Pension Tr. Fund v. Walton*, 294 A.3d 65, 85, 96 (Del. Ch. 2023).

the 2019 LLC Agreement and the New Year's Email on December 31, 2019, Jackson would have difficulty arguing that he was not on inquiry notice at that point. For Jackson to invoke that breach of duty to defeat a lawsuit filed in September 2023 would seem to come nine months too late.

That reasoning does not apply to this case because Jackson is invoking the breach of fiduciary duty as an affirmative defense.[60] "The purpose of statutes of limitation is to bar actions and not to suppress or deny matters of defense, whether legal or equitable; and it is a general rule that such statutes are not applicable to defenses, but apply only where affirmative relief is sought."[61] "The policy underlying statutes of limitations, that of preventing undue delay and stale claims, is not promoted by suppressing a valid defense arising out of the transaction at issue."[62] A party therefore can raise conduct as an affirmative defense even when a claim for relief based on the same facts would be time-barred.[63]

---

[60] Jackson has sought leave to file a third party complaint against Britton and Nielsen for fraud and breach of fiduciary duty. Dkt. 178. That motion will be addressed in due course.

[61] *Del. Chems., Inc. v. Reichhold Chems., Inc.*, 121 A.2d 913, 918 (Del. Ch. 1956) (Seitz, C.) (quoting 34 Am. Jur. 2d. *Limitation of Actions* § 63); *accord PNC Bank, Del. v. Turner*, 659 A.2d 222, 225 (Del. Super. Ct. 1995).

[62] *F.D.I.C. v. Notis*, 602 A.2d 1164, 1166 (Me. 1992); *see Martin v. Martin*, 287 S.W.3d 260, 266 (Tex. Ct. App. 2009) ("[T]he statute of limitations does not apply to a fraud claim pleaded defensively to defeat liability on an obligation induced by fraud."); *King v. Kitchen Magic, Inc.*, 391 A.2d 1184, 1185 (D.C. Ct. App. 1978) (same); *see also King Const., Inc. v. Plaza Four Realty*, LLC, 2012 WL 3518125, at *4 (Del. Super. Ct. Aug. 7, 2012) ("Ordinarily a defendant may amend a pleading to assert an affirmative defense even where the statute of limitations or other considerations would bar the assertion of a substantially similar counterclaim.").

[63] *See Skye Min. Invs., LLC v. DXS Cap. (U.S.) Ltd.*, 2021 WL 3184591, at *21 (Del. Ch. July 28, 2021) ("Notwithstanding the dismissal of claims, Counterclaim-Plaintiffs may

Sunder has sought equitable relief enforcing the Covenants that it procured through a breach of duty. Jackson is entitled to raise the circumstances surrounding the procurement of the Covenants as a defense. That is particularly true where Nielsen and Britton's conduct is attributable to Sunder and demonstrates why it would be inequitable for the court to grant Sunder the relief that it seeks.

### 3. Lack of Enforceability Because The Covenants Are Not Reasonable

Assuming for the sake of argument that the Covenants could be enforced under general principles of contract law, they do not pass muster under the additional requirements that restrictive covenants must meet. Delaware courts do not mechanically enforce restrictive covenants; instead they are "closely scrutinized."[64] Delaware courts "carefully review" restrictive covenants to ensure that they "(1) [are] reasonable in geographic scope and temporal duration, (2) advance a legitimate economic interest of the party seeking its enforcement, and (3) survive a balancing of the equities."[65] When reviewing restrictive covenants, Delaware courts have taken

---

present evidence of Counterclaim-Defendants' alleged misconduct to defend against or set off any potential damages arising from the affirmative claims asserted against them."); *Winklevoss Cap. Fund, LLC v. Shaw*, 2019 WL 994534, at *10 (Del. Ch. Mar. 1, 2019) ("Defendants have asserted as affirmative defenses fraud, fraudulent inducement, fraudulent misrepresentation, and unclean hands, among others, based on the same facts alleged in the counterclaims. I can discern no basis to restrict Defendants from presenting evidence of the Defendants' failure to honor agreements to promote Treats! as grounds to defend against Plaintiffs' claim that Defendants have not delivered all that was promised. Counterclaims based on this evidence, however, are time-barred.").

[64] *Faw, Casson & Co. v. Cranston*, 375 A.2d 463, 466 (Del. Ch. 1977).

[65] *FP UC Hldgs.*, 2020 WL 1492783, at *6 (quoting *Lyons Ins. Agency, Inc.*, 2018 WL 4677606, at *5).

into account the public interest in competition, the need for individuals to be able to earn a living, and the imbalances in bargaining power and repeat-player experience that exist between businesses and individuals.[66]

When evaluating the reasonableness of a restrictive covenant, a court examines the restriction holistically and in context. That means evaluating all of the dimensions of the restrictive covenant and considering how it operates with other restrictions in the contract. A court must not tick through individual features of a restriction in isolation, because features work together synergistically. For example, "a court must consider how the temporal and geographic restrictions operate together" because the "two dimensions necessarily interact."[67] A covenant that restricts employment in a similar industry for two years might be reasonable if it only applies within a single town or county, and vice versa. All else equal, a longer restrictive covenant will be more reasonable if geographically tempered, and a broader restrictive covenant will be more reasonable if temporally tailored. *Id.* A

[66] *See, e.g.*, *Elite Cleaning Co., Inc. v. Capel*, 2006 WL 1565161, at *4 (Del. Ch. June 2, 2006) (citing *Tristate Courier & Carriage, Inc.*, 2004 WL 835886, at *15); *Del. Elevator, Inc. v. Williams*, 2011 WL 1005181, at *10–11 (Del. Ch. Mar. 16, 2011). These considers apply with less force to sophisticated, highly compensated executives where, if anything, the bargaining power imbalance is on the other foot. Senior executives can retain counsel, bargain effectively with employers, and reach bespoke arrangements. They also can bargain for sufficient compensation to offset the potential cost of having to sit out due to a competition restriction. Sunder has suggested that Jackson was such an executive because he had the title of Vice President and received $6 million in commissions and profit distributions over the past four years. Both are pertinent considerations, but the dispositive factor here is the standardized nature of the Covenants, which were slipped into the 2019 LLC Agreement as terms that govern the Incentive Units. Jackson did not have the opportunity to engage in bargaining with Sunder, and the Covenants should not be interpreted as if he had that chance.

[67] *Del. Elevator,* 2011 WL 1005181, at *8.

court must also consider how one restriction interacts with another. A restriction on soliciting employees might be reasonable standing alone, but might become unreasonable when combined with other restrictions in the agreement.

When a restrictive covenant is overbroad, a Delaware court will resist "blue-penciling" the provision to make it reasonable. The differences in bargaining power between repeat-player businesses and individuals suggests that "when a restrictive covenant is unreasonable, the court should strike the provision in its entirety." *Id.* at *10. To blue-pencil the provision creates a no-lose situation for employers, because the business can draft the covenant as broadly as possible, confident that the scope of the restriction will chill some individuals from departing. If someone does challenge the provision, then the worst case is that the court will blue-pencil its scope so that it is acceptable. It also enables employers to extract benefits at the expense of employees by including unenforceable restrictions in their agreements.[68] The logical

---

[68] That proposition has real-world support. Scholars have documented that ordinary people hold naïve beliefs that courts will enforce contracts as written. *See generally* Tess Wilkinson-Ryan, David A. Hoffman & Emily Campbell, *Expecting Specific Performance* (forthcoming 2023), available at https://ssrn.com/abstract=4335951. A study that examined employee beliefs about the enforceability of competition restrictions found that employees who believed they were bound remained longer with a given employer and were less likely to leave that employer for a competitor. Evan Starr, J.J. Prescott, & Norman D. Bishara, *The Behavioral Effects of (Unenforceable) Contracts*, 36 J.L. Econ. & Org. 633, 666 (2020). The study found that 41.5% of employees who believed they were bound by competition restrictions cited the agreement as a reason for declining a competitor's job offer, and those findings remained consistent despite variations in state laws on the provisions' enforceability. *Id.* at 663, 666. Even in states where the competition restrictions were unenforceable, the study found that employees made decisions based on their naïve beliefs about enforceability and the likelihood of being sued; the actual law was largely irrelevant. *Id.* at 666. Another study found that 70% of employees with unenforceable competition restrictions were misinformed or uninformed about their enforceability and that their beliefs about the probability of an employer suing and the court enforcing the provision were not positively correlated with what the law provided. J.J. Prescott & Evan Starr, *Subjective*

result of such a system is sprawling restrictive covenants.[69] Accordingly, "[w]hile, in some circumstances, a court may use its discretion to blue pencil an overly broad non-compete to make its restrictions more reasonable, this court has also exercised its discretion in equity not to allow an employer to back away from an overly broad covenant by proposing to enforce it to a lesser extent than written."[70]

---

*Beliefs About Contract Enforceability*, J. Legal Stud. at 11 (forthcoming 2023), available at https://ssrn.com/abstract=3873638 ("[E]mployees bound by noncompetes tend to believe that noncompetes are enforceable in their states—even when they are not—and . . . this pattern is relatively stable across education levels."). The studies show that the language of contracts affects behavior, independent of laws determining their enforceability. Wilkinson-Ryan, Hoffman & Campbell, *supra*, at 26. "The penchant for overperformance is subject to manipulation by knowledgeable parties, who can free-ride on common mistakes." *Id.* at 47. By including unenforceable restrictive covenants in their contracts, employers gain a windfall at the expense of employees, because the employees naively expect that the restrictions will be enforced, regardless of the actual law. The findings about longer tenure and decreased likelihood to depart for a competitor reflect concrete benefits that employers secure by including unenforceable provisions. As noted above the line, the law should not create a "no-lose" scenario in which employers receive these benefits and, on those occasions when enforceability is challenged, gain the benefit of a lawful restriction through blue-penciling.

[69] *See* Charles A. Sullivan, *The Puzzling Persistence of Unenforceable Contract Terms*, 70 OHIO ST. L.J. 1127, 1151 (2009) ("[I]t seems likely that many [overbroad non-compete agreements], perhaps most, reflect the incentives the law has created for employers: ask for as much as possible, with the expectation that you will get at least what you're entitled to should the matter go to court."); Griffin Toronjo Pivateau, *Putting the Blue Pencil Down: An Argument for Specificity in Noncompete Agreements*, 86 NEB. L. REV. 672, 689–94 (2008) (arguing courts' willingness to modify non-competes creates confusion, encourages employers to overreach, and encourages litigation "by building a degree of uncertainty into every employment agreement").

[70] *FP UC Hldgs.*, 2020 WL 1492783, at *8 (cleaned up). Section 13.5 of the 2021 LLC Agreement purports to waive Jackson's ability to challenge the reasonableness of the Covenants. A provision of that sort is not valid under Delaware law. *See Kodiak Bldg. P'rs, LLC*, 2022 WL 5240507, at *5. The court has an independent obligation to review the reasonableness of restrictive covenants that cannot be bargained away. *See Lyons Ins. Agency, Inc.*, 2020 WL 429114, at *1 (noting that when enforcement of a contractual provision is "inimical to public policy," then "our courts will decline to enforce contractual obligations, no matter how clear or sincerely intended when entered.").

### a.    The Competition Restriction

Sunder seeks to enforce the Competition Restriction, but it is not reasonable.

It reads as follows:

> With respect to each Member or Unit Holder (each, a "Restricted Person"), for the period during which such Person owns Units and for a two (2)-year period thereafter (the "Restricted Period"), such Restricted Person shall not, and shall not cause or permit such Restricted Person's Affiliates to, directly or indirectly, engage or invest in, own, manage, operate, finance, control or participate in the ownership, management, operation, financing, or control of, be employed by, associated with, or in any manner connected with, lend any credit to, or render services or advice to, any business, firm, corporation, partnership, association, joint venture or other entity that engages or conducts any business the same as or similar to the Restricted Business, in all cases in the Territory; provided, however, that such Restricted Person may own less than five percent (5%) of the outstanding shares of any class of securities of any enterprise (but without otherwise participating in the activities of such enterprise) if such securities are listed on any national or regional securities exchange or have been registered under Section 12(g) of the Exchange Act.[71]

To evaluate the Competition Restriction, it is helpful to think in terms of the five newspaper reporter's questions: Whom does the restriction cover? What does it restrict? When does it apply? Where does it apply? Why is it justified? For the reasons explained previously, those dimensions must be considered individually and holistically.

Each of the Competition Restriction's dimensions is astonishingly broad. The first dimension is what it covers. It prohibits Jackson from being directly or indirectly involved or connected with any business that is the same as or similar to the

---

[71] PX 7 § 13.1(a) (formatting added).

Restricted Business. The 2021 LLC Agreement defines the Restricted Business as "the Business, and the business of engaging in the marketing and selling of services and products, including those related to pest control, alarms, solar, satellite, TV and wireless internet, directly to third parties in their homes, and taking other actions similar or related thereto." *Id.* § 1.1. The 2021 LLC Agreement defines the Business as "the sale, marketing and installation of photovoltaic systems and other solar services and products and provid[ing] other general services related to such activities and [] tak[ing], or caus[ing] to be taken other actions similar or related thereto." *Id.* § 2.3.

As written, the Competition Restriction prevents Jackson from working in any business engaged in "the marketing and selling of services and products . . . directly to third parties in their homes." The restriction specifically encompasses any business that markets or sells services or products to consumers in their homes related to "pest control, alarms, solar, satellite, TV and wireless internet." The Competition Restriction thus covers the entire door-to-door sales industry, without regard to whether Sunder markets or sells similar products.

The next dimension is whom it covers. The Competition Restriction envelopes not only Jackson but also his "Affiliates," defined as "(a) any person directly or indirectly controlling, controlled by, or under common control with another Person, and (b) with respect to any natural person, the spouse, parents, siblings and descendants (natural and adopted) of such natural person." PX 7 § 1.1. Importantly, the Competition Restriction does not use the concept of Affiliates for the limited

53

purpose of preventing Jackson from violating the Competition Restriction indirectly, such as by using a family member as an agent. As written, the Competition Restriction requires that Jackson prevent his Affiliates from engaging in any sales of products to consumers in their homes. As written, Jackson's daughter cannot go door to door selling Girl Scout cookies.

The next dimension is where the Competition Restriction applies. It covers the Territory, defined as:

> California, Nevada, Arizona, Utah, Colorado, Texas, Illinois, Florida, Georgia, Wisconsin, New Mexico, South Carolina, North Carolina, Maryland, Delaware, Pennsylvania, New Jersey, Connecticut, Massachusetts, Vermont, New Hampshire and Rhode Island and such other states in which, at any given time, the Company conducts, or reasonably anticipates conducting its business (including the Business).

*Id.* § 1.1. Nielsen testified that Sunder reasonably anticipates doing business in forty-six states. Nielsen 266:10–16, 267:2–7; *see also* PX 27 at 6. The only states that he did not anticipate entering were Alaska, Montana, North Dakota, and South Dakota. Those are beautiful states, but they hold only 1% of American households.[72] Standing alone, those markets hardly represent a fair opportunity for Jackson to pursue his livelihood, particularly when his family lives in Texas and cannot easily relocate due to his daughter's medical condition.

The next dimension is when the Competition Restriction applies. Its term is potentially indefinite, because it endures for "the period during which such Person

---

[72] That rough estimate uses data from the United States Census Bureau. https://www.census.gov/quickfacts/fact/table/US/HSD410221 (last visited Nov. 11, 2023) (identifying 124,010,992 households in the United States, 260,561 (0.21%) in Alaska, 436,481 (0.35%) in Montana, 316,542 (0.25%) in North Dakota, and 345,779 (0.27%) in South Dakota).

owns Units and for a two (2)-year period thereafter . . . ." PX 7 § 13.1(a). As discussed previously, Incentive Units are either unvested ("restricted") or vested ("released"). *Id.* § 3.4(c)(v). A holder of Incentive Units forfeits unvested units automatically when leaving Sunder. *Id.* §§ 3.5, 3.6. A holder does not automatically forfeit vested units, and although Sunder has the right to repurchase vested units for zero dollars, Sunder decides when to exercise that right. The call option gives Nielsen and Britton sole discretion over when the two-year clock starts. Because of transfer restrictions in the 2021 LLC Agreement, a holder of Incentive Units cannot divest himself of the units and start the clock. Nielsen and Britton can thus make the Competition Restriction last indefinitely.

Sunder argues that a potentially indefinite time period is fair because a holder of Incentive Units would continue to receive profit distributions from Sunder. Jackson historically received profit distributions of $400,000 per year. That is a tidy sum (about twice what a Delaware judge makes). But there is no reason to think that Nielsen and Britton would allow a departed holder of Incentive Units to continue to receive distributions. They are *profit distributions*, and as the individuals who control Sunder, Nielsen and Britton have myriad ways to divert consideration to themselves and other favored recipients while reducing what the holders of Incentive Units receive. Most obviously, they can pay themselves and their non-departing colleagues compensation as members, with those amounts coming ahead of and reducing profits. *Id.* § 5.8. They also could issue a preferred class of units with a senior distribution right that would have priority over the Incentive Units. *Id.* § 3.4(d). Or they could

simply amend the 2021 LLC Agreement to eliminate the Incentive Units' right to receive profits, then make up the difference to individuals who remained with Sunder through compensation arrangements or a new class of participating units. *Id.* § 15.9(a). Any moderately competent lawyer could come up with other ways to bypass the distribution right.

As written, the Competition Restriction is overly broad as to whom, what, where, and when it applies, but the analysis does not stop there. The Competition Restriction is all the more egregious because it interacts with the Customer Restriction. That restriction states:

> During the applicable Restricted Period, each Restricted Person shall not, and shall not cause or permit such Restricted Person's Affiliates to, directly or indirectly, solicit, canvas, transfer, assign, sell to or accept any business from, or engage in any business relationship relating to the Business with, for such Restricted Person's or such Restricted Person's Affiliates' benefit or on behalf of any entity: (i) any existing customer of the Company or any Person who was a customer of the Company prior to such Restricted Person ceasing to be a Member or Unit Holder; or (ii) any prospective customer of the Company for which such Restricted Person or such Restricted Person's Affiliates had responsibilities or duties with respect to or was involved in the development of such prospective customer, and such Restricted Person shall not, and shall not cause or permit such Restricted Person's Affiliates to, cooperate with others in doing or attempting to do so.[73]

---

[73] There is also the Stakeholder Restriction. It states:

During the applicable Restricted Period, each Restricted Person shall not, and shall not cause or permit such Restricted Person's Affiliates to, directly or indirectly, induce, influence, cause, advise or encourage any customer, prospect, employee, independent contractor, supplier, vendor, consultant, strategic partner, business partner, joint venturer or representative of the Company to terminate such Person's relationship with the Company, and such Restricted Person shall not, and shall not cause or permit such Restricted Person's Affiliates to, cooperate with others in doing or attempting to do so,

56

That is a pile of words.

As an initial matter, the Customer Restriction suffers from the same problems as to whom it covers and when it applies. The Customer Restriction might seem more reasonable as to the where, because it does not expressly refer to the Territory. But it more than makes up for that omission with the "what," because a Restricted Person cannot "directly or indirectly, solicit, canvas, transfer, assign, sell to or accept any business from" any present Sunder customer, past Sunder customer, or prospective Sunder customer for which Jackson had responsibilities or duties. Jackson was head of Sunder's nationwide sales. Read literally, the Customer Restriction applies to every homeowner in the states where Sunder did business before Jackson's departure. The Customer Restriction is not limited to the "marketing and selling of services and products . . . directly to third parties in their homes."

As written, the Customer Restriction bars Jackson from participating in any business that sells to any homeowner in the states where Sunder did business before Jackson's departure. Take Texas. Jackson could not take a job at a Best Buy in Dallas without violating the Customer Restriction as soon as he sold a television to a local homeowner. He could not take a job at a McDonalds in Houston without violating the Customer Restriction as soon as a local homeowner bought a Big Mac. And if he

---

and such Restricted Person shall not and shall not cause or permit such Related Person's Affiliates to, interfere with any of the Company's contracts or relationships.

*Id.* § 13.1(d). In the interest of brevity, this decision does not analyze the additional implications of its presence.

started his own store on Etsy offering NFL jerseys, he would violate the Customer Restriction as soon as he shipped one to a homeowner in Austin.[74]

The final dimension is why the Competition Restriction exists. Sunder asserts that the Competition Restriction is necessary to protect its investment in Jackson and any sales personnel who have remained at Sunder but could want to follow him to a new employer. The latter interest is illegitimate. Other sales personnel are not bound by restrictive covenants and can leave freely. The former interest is theoretically legitimate. *See Kan-Di-Ki, LLC v. Suer*, 2015 WL 4503210, at *20 (Del. Ch. July 22, 2015). In this case, however, Sunder has not shown that the Competition Restriction is appropriately tailored to protect that interest. The Competition Restriction instead is overly broad. This Ccurt "will not enforce a covenant that is more restrictive than [the company's] legitimate interests justify or that is oppressive." *Norton v. Cameron*, 1998 WL 118198, at *11 (Del. Ch. Mar. 5, 1998). The Competition Restriction is both oppressive and far more restrictive than any legitimate interest that Sunder could have.

---

[74] There is an argument that the Customer Restriction does not go so far. In its dense and poorly drafted text, one finds the qualifying phrase "relating to the Business." By squinting, it is possible to imagine that qualifier applying to the entire Customer Restriction, such that it only limits interactions with customers that relate to Sunder's business. Grammatically, that interpretation struggles with the placement of the modifier, which only appears to be part of the phrase "engage in any business relationship relating to the Business." If the drafters had wanted the limitation to apply to the Customer Restriction as a whole, they could have added a sentence that stated: "The foregoing restrictions only apply to the extent the Restricted Person's actions relate to the Business." But even if that limitation is credited, the 2021 LLC Agreement defines the Business as "the sale, marketing and installation of photovoltaic systems and other solar services and products and provid[ing] other general services related to such activities and [] tak[ing], or caus[ing] to be taken other actions similar or related thereto." *Id.* § 2.3. That still picks up quite a bit. It would however, allow Jackson to work at Best Buy or McDonalds or to start an Etsy business.

The Competition Restriction is unreasonable on its face and is therefore unenforceable.

### b. The Personnel Restriction

Sunder also seeks to enforce the Personnel Restriction, but it is not reasonable either. It reads as follows:

> During the applicable Restricted Period, each Restricted Person shall not, and shall not cause or permit such Restricted Person's Affiliates to, directly or indirectly, solicit, recruit, hire, induce or encourage to leave the employ of, or cease providing services to, the Company, any Person who is at that time an employee or independent contractor of the Company, or who has been employed of hired by the Company for any period of time, and such Restricted Person shall not, and shall not cause or permit such Restricted Person's Affiliates to, cooperate with others in doing or attempting to do so. The terms "solicit, recruit, hire, induce or encourage" include, directly or indirectly: (i) initiating communications with an employee or independent contractor of the Company relating to actual or possible employment or an independent contractor relationship for an entity other than the Company; (ii) offering bonuses or additional compensation to encourage or cause any employee or independent contractor of the Company to terminate employment with the Company; or (iii) supplying the names of, or otherwise referring or recommending, any employee or independent contractor of the Company to personnel recruiters or persons engaged in hiring for an entity other than the Company.

PX 7 § 13.1(b).

Like the Competition Restriction, the Personnel Restriction is overly broad as to whom it covers (not only Jackson but also his Affiliates) and when it applies (for the Restricted Period). Like the Customer Restriction, it is not limited to a particular area, but more than makes up for that with what it covers. The Personnel Restriction extends to (1) any current Sunder employee or independent contractor or (2) any person employed in the past by Sunder for any period of time. Jackson would violate the Personnel Restriction if he contacted someone who went door to door for Sunder

59

on one job in August 2019, shortly after Co-Founders started the business. The Personnel Restriction also applies regardless of why the employee or independent contractor leaves. The person might retire, and yet Jackson would have breached the Personnel Restriction if he lacked the foresight to refuse to offer rudimentary thoughts about whether the person had saved enough money. Or the person might leave the sales industry entirely and join a non-profit, and yet Jackson would have breached the Personnel Restriction if he lacked the self-discipline to refuse to discuss whether joining a non-profit would be more personally rewarding and aligned with that person's values.

If the Personnel Restriction was the only restrictive covenant binding Jackson, and if it (i) only restricted Jackson, (ii) only lasted for a reasonable time, (iii) only applied to current Sunder personnel, and (iv) only restricted recruiting existing personnel for another business, then the Personnel Restriction would be reasonable. As written, it is overly broad. In conjunction with the other Covenants, it is oppressive. The court will not enforce it.

## B.     Irreparable Harm And The Balancing Of The Hardships

Having found that Sunder does not have a reasonable probability of success on the merits for its claim against Jackson, the court does not need to consider the other elements of the preliminary injunction standard. While it seems likely that

60

irreparable harm likely would exist, the balancing of hardships could well provide an independent basis for declining to issue a preliminary injunction.[75]

## IV. THE REQUEST FOR A PRELIMINARY INJUNCTION AGAINST FREEDOM

Sunder has also sued Freedom, Brett Bouchy, Chad Towner, and Freedom Solar Pros (collectively, the "Freedom Defendants") for tortiously interfering with Sunder's rights under the 2021 LLC Agreement. Sunder contends that the Freedom Defendants induced Jackson to breach the Competition Restriction by joining Solar Pros, induced him to breach the Personnel Restriction by encouraging his sales organization to join Solar Pros, then caused him to continue to breach the Personnel Restriction by recruiting other Sunder sales personnel to join Solar Pros. Sunder seeks a preliminary injunction that would prevent the Freedom Defendants from continuing to tortiously interfere with Sunder's rights under the Covenants. Sunder's application fails because there is no underlying obligation to enforce and because the Freedom Defendants did not engage in tortious interference with contract under Utah law.

---

[75] The court must "balance the plaintiff's need for protection against any harm that can reasonably be expected to befall the defendants if the injunction is granted." *Mills Acq'n Co.*, 559 A.2d at 1279. Assuming the Covenants are enforceable, then Sunder will suffer irreparable harm if Jackson can freely compete with and solicit sales representatives from Sunder. But continuing to enjoin Jackson has a real human cost. Jackson is a high school graduate who has spent his entire career in door-to-door sales. Jackson 316–21. The Competition Restriction prohibits Jackson (and his spouse or descendants) from engaging in that business, effectively rendering Jackson unable to work in the only industry he knows. Jackson signed a consulting agreement with Solar Pros that pays him $10,000 per month, but that amount is insufficient to meet his family's needs due to the medical expenses associated with caring for his daughter. *See* JX 31; Jackson 409–14. Even if the Covenants were enforceable, the court would be inclined to deny the preliminary injunction application under these circumstances and require Sunder to seek a monetary remedy.

## A. Choice of Law For The Tortious Interference Claim

Once again, the analysis starts with choice of law. Sunder contends that Delaware law governs Sunder's tortious interference claim, while Freedom contends that Utah law controls.

The first step in a choice of law analysis is to decide if an actual conflict exists. If the competing jurisdictions apply the same principles of law, then there is no need to conduct a choice of law analysis. The parties agree that Utah and Delaware use different tests to analyze a tortious interference claim, so that requirement is satisfied.

To resolve a conflict, Delaware law applies the principles set out in the Restatement (Second) of Conflict of Laws.[76] Under that test, the court applies the law of the state with the most significant relationship to the controversy.[77] For a claim for tortious interference, the court considers:

> 1) the place where the injury occurred; 2) the place where the conduct causing the injury occurred; 3) the domicile, residence, nationality, place of incorporation and place of business of the parties; and 4) the place where the relationship, if any, between the parties is centered

*Id.* § 145(2). These factors lead to Utah law governing Sunder's tortious interference claim.

The first factor is the place where the injury occurred. When an injury consists of the loss of customers or business, "[t]he effect of the loss, which is pecuniary in its

---

[76] *Xcell Energy & Coal Co., LLC v. Energy Inv. Gp., LLC*, 2014 WL 2964076, at *5 (Del. Ch. June 30, 2014).

[77] Restatement (Second) of Conflict of Laws § 145(1) (1971).

nature, will normally be felt most severely at the plaintiff's headquarters or principal place of business." *Id.*, cmt. f. Sunder's headquarters is in Utah and, therefore, Sunder's injury occurred in Utah. The first factor favors the application of Utah law.

Citing *American Bottling Co. v. BA Sports Nutrition, LLC*,[78] Sunder argues that the place of injury should not receive much weight. In that decision, the Superior Court had to determine whether Delaware or Georgia law governed a claim for tortious interference. *Id.* at *16. The Superior Court recognized that "[f]or tortious interference cases, the place of injury is the *plaintiff's* headquarters." *Id.* at *17. But the plaintiff's headquarters was in Texas, not Georgia or Delaware. The Superior Court explained that "[t]his contact will not be given much weight since neither party has argued that Texas law should apply." *Id.* Here, the Freedom Defendants argue that Utah law should apply, and this factor favors the application of Utah law.

The second factor is where the conduct causing the injury occurred. The Restatement observes that when "the injury occurred in two or more states[,] . . . the place where the defendant's conduct occurred will usually be given particular weight." Restatement (Second) of Conflict of Laws § 145 cmt. e. The Freedom Defendants' allegedly wrongful actions took place in multiple jurisdictions, but no one contends that any of the conduct took place in Utah or Delaware. When choosing between those jurisdictions, the second factor is immaterial.

The third factor requires consideration of the domicile, residence, nationality, place of incorporation, and place of business of the parties. "[I]f the interest is a

---

[78] 2021 WL 6068705, at *17 (Del. Super. Ct. Dec. 15, 2021).

business or financial one, such as in the case of unfair competition, interference with contractual relations or trade disparagement . . . the place of business is the more important contact." *Id.* "Further, where the injury occurs in two or more states, the plaintiff's principal place of business is the single most important contact for determining the state of the applicable law as to most issues in situations involving. financial injury." *Id.* (cleaned up). As noted, Sunder's principal place of business is in Utah. Sunder argues that the court should apply Delaware law when determining whether two Delaware LLCs and their executives tortiously interfered with the LLC agreement of another Delaware LLC, but the Restatement says otherwise. Because Sunder's principal place of business is in Utah, this factor favors the application of Utah law.

The fourth factor is where the relationship between the parties is centered. Neither party contends that their relationship is centered in Delaware. To the extent the relationship between Sunder and Jackson is what matters (on the theory that that relationship was the subject of the tortious interference), then the relevant jurisdictions are Utah and Texas. To the extent the relationship between Sunder and Freedom is what matters, the relevant jurisdictions are Utah and California. To the extent the relationship between Sunder and Solar Pros is what matters, the relevant jurisdictions are Utah and Nevada. As between Utah and Delaware, this factor favors Utah.

Utah has the most significant relationship to Sunder's tortious interference claim. Utah law therefore governs that claim.

**B.    No Reasonable Likelihood Of Success Under Utah Law**

To succeed on a claim for tortious interference with contract under Utah law, a plaintiff must prove "(1) that the defendant intentionally interfered with the plaintiff's existing or potential economic relations, (2) by improper means, (3) causing injury to the plaintiff."[79] The claim also requires an underlying breach of contract.[80]

Given these requirements, Sunder's claim for tortious interference cannot succeed. For the reasons already discussed, Sunder has not shown a reasonable likelihood of proving a breach of the 2021 LLC Agreement. That alone is dispositive.

Assuming Sunder had shown a breach, Sunder cannot show that the Freedom Defendants interfered with Sunder's rights by improper means. The Supreme Court of Utah has defined "improper means narrowly to include only those actions that are contrary to law, such as violations of statutes, regulations, or recognized common-law rules, or actions that violate an established standard of a trade or profession."[81] "[A] non-exhaustive list of conduct that would constitute improper means [includes] violence, threats or other intimidation, deceit or misrepresentation, bribery, unfounded litigation, defamation, or disparaging falsehoods." *Id.* at 394–95 (cleaned up). Under that test, the interfering acts must be "independently tortious or wrongful." *C.R. England*, 437 P.3d at 354.

---

[79] *Eldridge v. Johndrow*, 345 P.3d 553, 556 (Utah 2015).

[80] *See St. Benedict's Dev. Co. v. St. Benedict's Hosp.*, 811 P.2d 194, 201 (Utah 1991).

[81] *Com. Club*, 529 P.3d at 394 (quoting *C.R. Eng. v. Swift Transp. Co.*, 437 P.3d 343, 354 (Utah 2019)).

Sunder does not argue that the Freedom Defendants used improper means to recruit Jackson. Any claim for tortious interference based on Sunder's contractual relationship with Jackson therefore fails under Utah law.

Sunder attempts to argue that the Freedom Defendants used improper means to interfere with the Covenants by using Jackson "to induce additional Sunder sales representatives to leave Sunder" and by telling Sunder's sales force "that they would no longer be paid if they remained with Sunder." Pl's Reply Br. at 30–31. Sunder contends that the latter conduct involves deceit, misrepresentation, and disparaging falsehoods.

In making this argument, Sunder seemingly refers to communications that (i) Freedom posted on September 29, 2023, on a portal for sales representatives that Freedom operates and (ii) Freedom sent to Sunder sales personnel in emails and text messages. Those communications stated that "Sunder Energy has terminated their relationship with [Freedom]." Am. Compl. ¶¶ 150, 156, 159. That was not a misrepresentation but rather a true statement. The communications also stated that "Eric Nielsen, President of Sunder, has requested that [Freedom] immediately discontinue paying sales commissions to its sales representatives and leaders," with one communication containing a screenshot of the language from Sunder's termination letter. *Id.* ¶¶ 150, 156–57, 159. That was also a true statement.

In addition to these statements, the communications included an offer to join another Freedom dealer: "For any sales reps or leaders that transition to another Freedom Dealer, Freedom will ensure that you receive the full commissions on your

entire pipeline." *Id.* ¶¶ 150, 156, 159. The communications invited sales representatives to continue working with Freedom, stating: "If you have the desire to continue selling with [Freedom], please submit this webform and we will reach out to assist you in making this transition as soon as possible." *Id.* ¶ 150, see *id.* ¶¶ 156, 159. Neither statement was misleading, deceitful, or disparaging. Sunder has tried to suggest that Freedom's statement implied that sales representatives would not be paid if they stayed at Sunder, but the statement instead makes clear that sales representatives would not be walking away from their commissions if they joined another Freedom dealer.

Those communications do not constitute an independently tortious act. Sunder has failed to show a reasonable likelihood that the Freedom Defendants used improper means to interfere with the Covenants.

## V. CONCLUSION

Sunder's application for a preliminary injunction is denied. That does not mean that Sunder is destined to lose at trial. Still, its options are limited. This decision has held that Sunder cannot enforce the Covenants as a matter of law, so Sunder cannot rely on those provisions to secure a remedy from Jackson. This decision has held that Sunder cannot prevail on its claim for tortious interference against the Freedom Defendants as a matter of law, so that path is no longer available either. But Sunder may have non-contractual theories that could support a recovery from Jackson for actions he took before resigning from Sunder. This decision provides no opportunity to assess the merits of any possible non-contractual claim that focused Jackson's pre-departure acts.

67